510 A.2d 608

**Dale R. MARTIN et al.**

v.

**Morris W. FARBER.**

**No. 1577, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

July 3, 1986.

Certiorari Denied Dec. 5, 1986.

138

Frances Gambo, Lutherville, for appellants.

Eugene A. Alexander, III, Baltimore (Thomas E. Rosser and Clarke Murphy, Jr., on brief), Towson, for appellee.

Before GILBERT, C.J., and ROSALYN B. BELL and WENNER, JJ.

GILBERT, Chief Judge.

We are asked to determine 1) whether an antenuptial agreement entered into by Morris W. Farber and Nettie Sue Farber in 1939 is still valid and enforceable; and 2) whether the imposition of a constructive trust on the estate of Nettie Sue Farber was proper.

Three days prior to their marriage on June 22, 1939, Nettie Sue Farber, then Nettie Sue Goldberg, and Morris W. Farber entered into an antenuptial agreement. The agreement provided, in essence, that Mrs. Farber would retain sole control of the property she acquired either prior to or during the marriage. Mr. Farber relinquished all rights in the property and estate of Mrs. Farber.

At the time of the execution of the agreement, Mrs. Farber was 39 years old, a widow, and the mother of two boys. Her first husband, Dr. Chester Goldberg, died in 1936. Mrs. Farber inherited property from him which included real estate located in Baltimore City. She also received from insurance proceeds more than $20,000.

Mr. Farber, although steadily employed as an electrician, had no accumulated wealth at the time of his marriage to Mrs. Farber. He did, however, continue to work until his retirement in 1967. During his forty-four year marriage to Mrs. Farber, Mr. Farber turned his paychecks over to his wife. Mrs. Farber, meanwhile, remained at home and managed the couple's household and financial affairs.

When Mrs. Farber died intestate in August, 1983, she had accumulated in her own name assets valued at approximately $275,000. The Orphan's Court for Baltimore County appointed Mr. Farber as personal representative of his deceased wife's estate. Mrs. Farber's grandchildren [1] filed a petition in the Circuit Court for Baltimore County to remove Mr. Farber from that position. They asserted that he had signed a valid antenuptial agreement in which he renounced any claim to Mrs. Farber's estate. In response, Mr. Farber filed a petition for declaratory relief alleging that the antenuptial agreement was invalid, and that under Maryland's intestacy laws he was entitled to his share of the estate.

Following a trial in the Circuit Court for Baltimore County, the judge concluded that while "[i]t is ... true that many, many years ago Morris released any claim that he might have to Nettie's property or estate, ... after some forty-four years of a seemingly happy marriage, in which Morris turned everything he earned over to Nettie without question, and also upon her assurances that she would take care of Morris, it would not only be unjust, but unconscionable for the court to enforce ... [the agreement]." The trial judge determined that a constructive trust should be imposed upon Mrs. Farber's estate for the benefit of Mr. Farber during his life; the remainder to be distributed equally to Mrs. Farber's heirs. Dissatisfied with the decision of the trial court, both sides appealed.

The grandchildren claim that the antenuptial agreement is "valid and enforceable" and that Mr. Farber is precluded from obtaining any interest in Mrs. Farber's estate. Mr. Farber contends, however, that the trial judge's decision not to enforce the agreement was "a correct one." He, nevertheless, maintains that since "the agreement is not to be

---

1. Although Mrs. Farber was survived by three grandchildren, the youngest of those grandchildren, Harold M. Jones, was adopted outside of the family. Upon being told that he was no longer entitled to share in his grandmother's estate, Mr. Jones withdrew from the suit.

enforced, ... the proper action of the lower court should have been to pass an order that the intestacy law would determine the distribution of assets of the estate." Proceeding from that premise, Mr. Farber further asserts that he is entitled to "the first $15,000 plus ½ of the residue" of his wife's estate. Md.Est. & Trusts Code Ann. § 3–102.

## The Antenuptial Agreement

■ "The validity, propriety, and, indeed, favor in the eyes of the law of antenuptial agreements settling or barring property rights of the parties is recognized." *Hartz v. Hartz,* 248 Md. 47, 55, 234 A.2d 865, 870 (1967). Nevertheless, because the parties to an antenuptial agreement stand in a confidential relationship, the courts must guard against agreements which are unfair and inequitable. *See Frey v. Frey,* 298 Md. 552, 558, 471 A.2d 705, 711 (1984).

■ In determining the validity of an antenuptial agreement, a court must consider: 1) was there a fair and reasonable provision for the spouse's relinquishing his or her rights; or 2) in the absence of such provision, was there "[f]rank, full and truthful disclosure of what is being relinquished (or in lieu thereof actual knowledge otherwise available or obtained). . . ." *Hartz,* 248 Md. at 57, 234 A.2d at 871. Equally important is the question of whether the agreement was entered into freely and voluntarily. *Del-Vecchio v. DelVecchio,* 143 So.2d 17, 20 (Fla.1962).

The courts, in weighing the fairness and reasonableness of the provision for the spouse waiving his or her rights, generally take into account,

"the situation of the parties, their ages, their respective holdings and income, their respective family obligations or ties, the circumstances leading to the execution of the agreement, the actions of husband and wife after the marriage as they tended to show whether the agreement was voluntarily and understandingly made, the needs of him or her who made relinquishment, including whether

or not that one, after the death of the other, can live substantially as comfortably as before the marriage." *Hartz*, 248 Md. at 58–59, 234 A.2d at 872.

The element of "reasonableness must be weighed as of the time of the execution of the agreement." Lindey, *Separation Agreements and Antenuptial Contracts*, § 90–53 (1985).

Some courts, for public policy reasons, have imposed another test—one of conscionability—in order to determine the validity of antenuptial agreements, at least with regard to provisions relating to maintenance and sustenance on dissolution of marriage. Under that particular test, "such provisions may lose their legal vitality by reason of changing circumstances which render the antenuptial provisions for maintenance to be unconscionable at the time of the marriage dissolution." *Newman v. Newman*, 653 P.2d 728, 734 (Colo.Sup.Ct.1982). The Colorado court said that,

> "even though an antenuptial agreement is entered into in good faith, with full disclosure and without any element of fraud or .overreaching, the maintenance provisions thereof may become voidable for unconscionability occasioned by circumstances existing at the time of the marriage dissolution."

*See also Hill v. Hill*, 356 N.W.2d 49 (Minn.App.1984); *Gross v. Gross*, 11 Ohio St.3d 99, 464 N.E.2d 500 (1984); *Marschall v. Marschall*, 195 N.J.Super. 16, 477 A.2d 833 (1984); *Scherer v. Scherer*, 249 Ga. 635, 292 S.E.2d 662 (1982); *Osborne v. Osborne*, 384 Mass. 591, 428 N.E.2d 810 (1981).

Other tribunals, citing the underlying State interest in the welfare of the divorced spouse, have simply invalidated maintenance or sustenance provisions in antenuptial agreements or have held them to be altogether void. The Oregon Supreme Court in *Unander v. Unander*, 265 Or. 102, 506 P.2d 719 (1973), ruled that an antenuptial agreement will be enforced unless the spouse is deprived of support that she cannot otherwise secure. An Illinois appellate court voided

an antenuptial agreement waiving alimony because of an attempted avoidance by a husband of his legal duty to support his spouse. *Eule v. Eule,* 24 Ill.App.3d 83, 320 N.E.2d 506 (1974). In *Connolly v. Connolly,* 270 N.W.2d 44 (S.D.1978), the Supreme Court of South Dakota declared that the public interest requires post-marriage dissolution support be assessed as of date of dissolution of the marriage and that any antenuptial agreement to the contrary was void. Iowa, on the ground of public policy, struck down an antenuptial agreement which prohibited alimony. *In re Marriage of Gudenkauf,* 204 N.W.2d 586 (Iowa 1973).

Notwithstanding the apparent willingness of some courts to subject maintenance and sustenance provisions to conscionability review, there appears to be little support for extending that review to provisions respecting the devolution of property at the time of death of one of the spouses. *See Gross,* 11 Ohio St.3d 99, 464 N.E.2d 500; *Newman,* 653 P.2d 728.

The judge in the matter *sub judice* concluded that although the agreement executed by the Farbers was "viable" it would not be enforced because it would be unconscionable to do so. Despite the court's specific ruling, the appellants continue to argue that the agreement meets all of the criteria set forth in *Hartz v. Hartz,* 248 Md. 47, 234 A.2d 865 (1967). The viability of the antenuptial agreement is not, however, contested on appeal. The issue before this Court is whether the hearing judge could set aside an otherwise valid antenuptial agreement on the ground that its enforcement would be unconscionable.

The doctrine of "unconscionability" is defined in § 208 of the Restatement (Second) of Contracts as follows:

"If a contract or term thereof is unconscionable *at the time the contract is made* a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result." (Emphasis supplied.)

That definition was recently cited with approval by the Court of Appeals in *Williams v. Williams,* 306 Md. 332, 508 A.2d 985, 988 (1986) (No. 85, slip op. at 7, September Term, 1985, filed May 22, 1986). Historically, an agreement has been held to be unconscionable if it is "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." *Hume v. United States,* 132 U.S. 406, 10 S.Ct. 134, 33 L.Ed. 393 (1889), quoting *Earl of Chesterfield v. Janssen,* 2 Ves.Sen. 125, 155, 28 Engl.Rep. 82, 100 (Ch. 1750). Even though the doctrine of unconscionability permits the courts to exercise considerable leeway in avoiding inequitable results, that permissiveness is not without bounds.

"[W]hen determining whether an entire contract or any of its parts is so unconscionable as to justify its judicial rescission or cancellation, the matter will not be judged by hindsight but by the situation as it existed at the time the bargain was struck."

*Gladding v. Langrall, Muir & Noppinger,* 285 Md. 210, 213, 401 A.2d 662, 664 (1979).

■ Phrased differently, the fairness of an agreement is to be determined as of the time it was made, not on the basis of conditions occurring subsequently. *Gladding,* 285 Md. at 214, 401 A.2d at 665. Courts are not possessed of unbridled discretion to undo that which the parties fairly and voluntarily assumed, even if the agreement might be deemed imprudent.

■ With that precept firmly in mind, we hold that the trial judge erred in ruling that the agreement was unconscionable. It was not. Nothing in the Farbers' antenuptial agreement or in the circumstances surrounding its execution renders it unconscionable or otherwise legally objectionable. The trial judge palpably relied on circumstances arising after the execution of the agreement. He was particularly concerned by the fact that Mr. Farber turned everything he earned over to Mrs. Farber, and that she repeatedly assured her husband that she would take care of

him. No matter how disturbing those facts may be, they do not afford an adequate base for the court's ruling. The court, as we have said, was bound to decide the validity of the agreement and the process by which it was reached as of the time the agreement was made, and not by any post-agreement occurrences.

### Constructive Trust

The decision with regard to the validity and enforceability of the agreement does not, however, end our inquiry. Yet to be determined is whether, under the circumstances of the instant case, a constructive trust was properly imposed.

A constructive trust has been defined as:

"A ... remedy employed by a court ... to convert the holder of the legal title to property into a trustee for one who in good conscience should reap the benefits of the possession of said property. The remedy is applied by operation of law where property has been acquired by fraud, misrepresentation, or other improper method, or where the circumstances render it inequitable for the party holding the title to retain it."

*Wimmer v. Wimmer,* 287 Md. 663, 668, 414 A.2d 1254, 1258 (1980); *see also Siemiesz v. Amend,* 237 Md. 438, 206 A.2d 723 (1964).

Ordinarily, before a constructive trust can be impressed by a court, there must be "clear and convincing evidence of wrongdoing" coupled with "circumstances which would render it inequitable for the holder of legal title to retain the beneficial interest." *Wimmer,* 287 Md. at 668, 414 A.2d at 1258; *Peninsula Methodist Homes and Hospitals, Inc. v. Cropper,* 256 Md. 728, 261 A.2d 787 (1970). When a confidential relationship exists, different rules are applicable. *Wimmer,* 287 Md. at 668, 414 A.2d at 1258; *Fant v. Duffy,* 232 Md. 481, 194 A.2d 293 (1963).

In order to establish the existence of a confidential relationship, it must be shown that "one party is under the domination of another, or ... [that] the circumstances [are

such that] ... [one] party is justified in assuming that the other will not act in a manner inconsistent with his or her welfare." *Bass v. Smith,* 189 Md. 461, 469, 56 A.2d 800, 804 (1948). Once it is demonstrated that a confidential relationship exists, "a presumption arises that confidence was placed in the dominant party [by the subservient party] and that the transaction complained of resulted from fraud or undue influence and superiority or abuse of the confidential relationship by which the dominant party profited." *Wimmer,* 287 Md. at 669, 414 A.2d at 1258; *Wenger v. Rosinsky,* 232 Md. 43, 192 A.2d 82 (1963). The presumption shifts the burden to the dominant party to show, by clear and convincing evidence, that the transactions entered into were fair and reasonable. *Wimmer,* 287 Md. at 669, 414 A.2d at 1258.

The record before us reveals that throughout the Farbers' forty-four year marriage, Mrs. Farber stayed at home attending to the domestic chores as well as the couple's financial matters. Mr. Farber continued to work outside the home. He regularly earned wages which he diligently turned over to his wife. Those facts, when viewed in light of Mrs. Farber's repeated assurances to her husband that she would take care of him, lead us to the conclusion that a confidential relationship existed between the Farbers and that Mrs. Farber was the dominant of the two.

Based on the evidence presented to support Mr. Farber's assertion that his wife abused that confidential relationship by using his earnings to acquire assets which she titled or placed solely in her own name, we agree that the imposition of a constructive trust was proper. We think, however, that the trust should only be imposed to the extent that Mr. Farber's funds were used to acquire assets which were not a part of or attributable to the assets in Mrs. Farber's estate prior to the marriage of the couple. In limiting the scope of the constructive trust imposed in the case *sub judice,* we are mindful of a primary purpose of that form of

trust—to prevent unjust enrichment. Therefore, the constructive trust should be limited to the extent Mr. Farber is able to trace his funds into his late wife's estate. The imposition by the trial court of a constructive trust over the entire estate, without regard to the amounts actually contributed by Mr. Farber, was error.

We do not consider the appellants' contention that Harold Martin Jones, having been adopted outside of the family of Mrs. Farber, is no longer entitled to share in his grandmother's estate inasmuch as that issue was not decided by the lower court. Md.Rule 1085.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION. COSTS TO BE DIVIDED BETWEEN THE PARTIES.