458

76 A.3d 1221

Barbara Ann STEWART

v.

James Edward STEWART.

No. 0249, Sept. Term, 2011.

Court of Special Appeals of Maryland.

Oct. 3, 2013.

460

Andrea A. Baddour (Kenneth Wilcox, LaFayette Law Office, on the brief) Prince Frederick, MD, for appellant.

Thomas E. Pyles, Waldorf, MD, for appellee.

Panel: KRAUSER, C.J., MATRICCIANI, CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

KRAUSER, C.J.

Before appellant, Barbara Ann Stewart, married appellee, James Edward Stewart, in 1988, she signed a prenuptial[1] agreement, prepared by Mr. Stewart's attorney. In that agreement, she waived any interest she had in certain enumerated items of property owned by Mr. Stewart. Twenty-one years later, Mr. Stewart filed a divorce action in the Circuit Court for Charles County, requesting, among other things, the enforcement of the prenuptial contract. In response, Ms. Stewart filed an answer questioning the validity of that agreement together with a counter complaint for divorce.

A hearing was ultimately held to address the question whether the parties' prenuptial agreement was valid and enforceable. When the Charles County circuit court held that it was both, the Stewarts entered into a property settlement and separation agreement that incorporated the terms of the prenuptial. But that did not resolve all of the matters in dispute between the parties as, in the parties' settlement agreement, Ms. Stewart had reserved the right to appeal the circuit court's validation of the prenuptial agreement.

---

1. We use the term "prenuptial agreement" instead of its synonym, "antenuptial agreement," throughout this opinion, as the former is "far more common" in American English today. Bryan A. Garner, *A Dictionary of Modern Legal Usage* 62 (2d ed.1995).

After the circuit court granted Mr. Stewart a divorce, Ms. Stewart predictably noted this appeal, challenging the lower court's decision to uphold the parties' prenuptial agreement. That agreement, she alleges, was neither valid nor enforceable, because of Mr. Stewart's failure to fully and frankly disclose all of his property interests and assets and because he presented the agreement to her so close in time to their impending marriage that she had no opportunity to consult with counsel before signing it. She further contends that it was unconscionable, because it was "clearly one-sided" and because she signed it "without valuable consideration or understanding of what rights she was waiving."

We find no merit to any of Ms. Stewart's claims. The prenuptial agreement was valid and enforceable, and, furthermore, it was not, from either a procedural or substantive perspective, unconscionable.

### Background

Ms. Stewart was a single, twenty-six-year-old woman when, in 1986, she met and engaged in an affair with Mr. Stewart, a married, twenty-four-year-old father of three. At that time, she worked at a daycare center for minimum wage, while, in stark economic contrast, Mr. Stewart owned a successful construction business. What began as an affair ultimately developed into a relationship, and the parties began to live together.

Planning to marry, once Mr. Stewart obtained a divorce from his current wife, the parties selected a wedding date of October 22, 1988. Because, at that time, he had approximately $2 million in assets and his pending bride had practically none, Mr. Stewart informed the future "Mrs. Stewart," that he would not marry her unless she agreed to sign a prenuptial agreement, waiving any and all interest in his assets. His attorney thereafter drafted such an agreement, and Mr. Stewart presented it to Ms. Stewart for her consideration and signature before the wedding.

As to the date on which that occurred, the parties do not agree. At the hearing below, Mr. Stewart claimed that he first gave Ms. Stewart a copy of the prenuptial agreement in "the last part of September 1988," while Ms. Stewart maintained that she did not receive it until the day she signed it. But the parties do agree that Ms. Stewart did sign the prenuptial agreement four days before their wedding date and that Mr. Stewart signed it, either the same day or the next. At the time Ms. Stewart signed the agreement, she was not represented by counsel and would later claim that she had no opportunity to consult with counsel, as she was presented with the prenuptial just four days before the parties' wedding. But there is no indication in the record as to whether her impending wedding or any event or circumstance would have impeded an effort to consult with counsel.

The prenuptial agreement began with a preambular statement declaring: "WHEREAS, both parties have been afforded the opportunity to retain, advise, and consult with independent counsel of their own choice[.]" It then went on to avow that each party "hereby waives, releases, and relinquishes all right, title, estate, and interest" in any "property owned by [the other] at the time of the marriage . . . and in [the other's] estate upon . . . death." [2] The agreement thereafter listed the following items of property owned by Mr. Stewart or his company, Waldorf Concrete, Inc., that is: Waldorf Concrete itself; fifty acres of real property located near Maryland Route 231 and subject to a $190,000 deed of trust; four condominium units in Waldorf Business Square; a lot in West Virginia; and "[s]tock ownership and interest" in Brandywine Building Supply, Inc.

The agreement omitted, however, any mention of Mr. Stewart's individual retirement account ("IRA"), which was then worth, according to him, "around $60,000" or three percent of

---

**2.** The agreement also provided that each party waived any interest in property "acquired by [the other] at any time thereafter." But, as Ms. Stewart has not specifically challenged the validity of this provision, we have left it out of our burgeoning text.

his $2 million worth of premarital assets. It also failed to mention any property owned by Ms. Stewart, though that omission was, to be sure, inconsequential, as, at the time Ms. Stewart signed the prenuptial agreement, the only property that she owned was a used Ford Maverick, which was worth, as she put it, "maybe" $500.

The agreement reserved for each party "the right to transfer or convey to the other any property or interest therein which may be lawfully conveyed or transferred during his or her lifetime or by Will" and further provided that "neither party intend[ed] by this Agreement to limit or restrict in any way the right and power . . . to receive any such transfer or conveyance from the other," but added that "no representations or promises of any kind whatsoever have been made" by either party as to "any such transfer or conveyance."

Paragraph 5 of the agreement then declared that each party covenants and represents to the other that he or she has disclosed to the other the nature and extent of his or her various property, interest and sources of income, as disclosed herein, fully and fairly reflect the said property, interests and sources of income of each party, respectively.

Paragraph 6 added that Ms. Stewart

declares that she fully understands the terms and provisions of the Agreement, that she has been fully informed of her legal rights and liabilities, that she believes that the provisions of this Agreement are fair, just and reasonable and that she signs this Agreement freely and voluntarily, acting under the advice of independent legal counsel.

A substantively identical provision, paragraph 7, applied to Mr. Stewart.

After the parties were married, Ms. Stewart left her daycare job and, less than seven months later, gave birth to the first of the parties' three children. To provide a residence for his new family, Mr. Stewart subdivided the fifty-acre parcel near Maryland Route 231 and built, on a nine-acre plot, a large house with a "big pool." He then titled the home in both his name and Ms. Stewart's, as tenants by the entireties. To

pay off the mortgage on the parties' home, he later sold a number of the assets he had listed in the prenuptial agreement.

In addition to their marital home, the Stewarts acquired, during their marriage, two other properties, one near their home and the other in upstate New York. Both Stewarts were listed on the titles of the two properties, as tenants by the entireties. By the date of the hearing below, the Maryland property was worth a "minimum" of $800,000, while the New York property was worth a "minimum" of $625,000. Neither property was encumbered by a mortgage.

When he was in his mid-forties, Mr. Stewart "closed up" his company, Waldorf Concrete, Inc., and retired. But his marriage did not survive his retirement. Amid cross-accusations of adultery, Mr. Stewart filed a complaint for divorce in the Charles County circuit court, which, among other things, sought enforcement of the parties' prenuptial agreement. In response, Ms. Stewart filed an answer challenging the validity of the prenuptial agreement as well as a counterclaim for divorce.

After a hearing was held on the question of whether the prenuptial agreement was valid and enforceable, the court found that it was both. In so ruling, it said that, even assuming the truth of Ms. Stewart's "description of the history and circumstances" under which she signed the prenuptial agreement, her "mind set was that the substance of the agreement ... didn't matter an awful lot to her because her position was she loved him, she was gonna marry him regardless." That is why, or so the court seemed to suggest, that although by her own account, she had "three or four days" to seek counsel, she, in the court's words, "elected not to do that."

That is not to say that she was unaware of the content of the prenuptial agreement. On the contrary, according to the circuit court, "she read through the thing and she knew what it said, she was familiar with some of ... the major assets that the document lists," including the property on Route 231 and

the concrete business. Moreover, the document itself notified her that "Mr. Stewart and/or his company" owned the condominium units which housed the concrete business. And then, upon finding that there was no evidence of duress, coercion, or undue influence, the circuit court declared the parties' prenuptial agreement to be valid and enforceable.

Following that ruling, the parties entered into a property settlement and separation agreement, which was incorporated, but not merged, into an ensuing judgment of absolute divorce. That, in turn, was followed by a consent order addressing custody and child support matters. But, of particular significance, as it is the foundation of this appeal, the property settlement and separation agreement expressly reserved to Ms. Stewart the right to appeal the circuit court's earlier ruling upholding the validity of the prenuptial agreement, and, once judgment was entered, she did precisely that in noting this appeal.

### Discussion
### I.

Ms. Stewart contends that the circuit court erred in upholding the validity and enforceability of the prenuptial agreement because Mr. Stewart, she alleges, did not fully, frankly, and truthfully disclose the value of his property. Specifically, the agreement did not mention, she points out, Mr. Stewart's ownership of an IRA. Nor did it, she complains, indicate monetary values for the assets listed therein.

Because she did not have actual knowledge of the value of Mr. Stewart's assets, Ms. Stewart claims, relying on *Ortel v. Gettig*, 207 Md. 594, 116 A.2d 145 (1955), that the agreement was invalid. In *Ortel*, the Court of Appeals declined to uphold a prenuptial agreement because there was inadequate disclosure of the value of the husband's assets. It reasoned that the wife's "knowledge of the fact that the husband had an electrical business" and owned various real properties (but not their "actual value") was so "indefinite" that she could not be deemed to have "actual knowledge of his worth." *Id.* at 612,

116 A.2d 145. Ms. Stewart suggests that we should reach the same conclusion for the same reasons here. Maintaining that she too had, at best, "indefinite knowledge" of Mr. Stewart's worth, which fell "far short" of actual knowledge, Ms. Stewart claims that her prenuptial agreement, like the one in *Ortel*, was invalid for that reason.

To bolster her claim, Ms. Stewart adds that paragraph 3B of her prenuptial agreement stated that Mr. Stewart had an interest in Waldorf Concrete, Inc., but declined to address the value of that interest, stating, without further elaboration, the following:

> B. Waldorf Concrete, Inc., a corporation organized according to the laws of the State of Maryland. The property herein described and described within the provision of paragraph one [whereby Barbara purportedly waived any interest in James's property] shall include any appreciated value of the property described and shall further include any appreciated value which may be attributable to the reduction of any encumbrances.

Ms. Stewart insists that, without an accountant's statement, she "had no way to calculate" the present value of Waldorf Concrete, at the time she signed the agreement, nor did she have any means to perform a future earnings analysis. As a result, she neither knew nor had any way of knowing the value of Mr. Stewart's interest in Waldorf Concrete. Ms. Stewart further contends that the prenuptial agreement at issue was invalid for lack of consideration, specifically asserting that there was "no consideration ... other than marriage," which, according to her, "is not to be deemed valuable consideration."

 Because a prenuptial agreement is a contract, we review it "under the objective law of contract interpretation." *Cannon v. Cannon*, 384 Md. 537, 553, 865 A.2d 563 (2005). We do so, mindful that, unlike the normal run of contracts, prenuptial agreements invariably involve a confidential relationship that is "presumed to exist as a matter of law" between the parties entering into that kind of an agreement. *Id.* at 572, 865 A.2d 563. To establish the validity of such a

contract, the agreement's proponent must show that there was no "overreaching," *id.* at 568, 865 A.2d 563, that is, that "in the atmosphere and environment of the confidential relationship," there was neither "unfairness" nor "inequity" in "the result of the agreement or in its procurement." *Hartz v. Hartz,* 248 Md. 47, 57, 234 A.2d 865 (1967).

That may be achieved in several ways. One of which is to show that the agreement "documents a full, frank, and truthful disclosure," *Cannon,* 384 Md. at 573, 865 A.2d 563, of the "worth of the property, real and personal, as to which there is a waiver of rights in whole or in part, so that he or she who waives can know what it is he or she is waiving." *Hartz,* 248 Md. at 56–57, 234 A.2d 865. Indeed, if this standard is met, the agreement may well be rendered resistant to attack. *Id.* In the absence of such a disclosure, "adequate knowledge"[3] of what that disclosure would have revealed "may serve as a substitute" for such disclosure and thereby confirm that there was no overreaching. *Id.* at 57, 234 A.2d 865; *accord Cannon,* 384 Md. at 574, 865 A.2d 563. "Proof of knowledge, unlike full, frank, and truthful disclosure, does not require that the enforcing party demonstrate that the attacking party had knowledge of the discrete value of each asset. Instead, knowledge means that the attacking party must be shown to have adequate knowledge—knowledge of the existence of the assets subject to the waiver and knowledge of what those assets are worth in sum so that the attacking party may be found to know what it is he or she is waiving." *Cannon,* 384 Md. at 573–74 n. 21, 865 A.2d 563.

As the Court of Appeals has explained, the "purpose behind a requirement of disclosure or knowledge is 'so that he or she who waives can know what it is he or she is waiving.'" *Id.* at 574, 865 A.2d 563 (quoting *Hartz,* 248 Md. at 56–57, 234

---

**3.** The Court of Appeals has used the terms "adequate knowledge" and "actual knowledge" interchangeably, in discussing substitutes for full, frank, and truthful disclosure in the context of prenuptial agreements. *See Cannon v. Cannon,* 384 Md. 537, 568, 865 A.2d 563 (2005); *Hartz v. Hartz,* 248 Md. 47, 57–58, 234 A.2d 865 (1967).

A.2d 865). If either disclosure or knowledge "is proven by the enforcing party and insufficiently rebutted by the attacking party, there can be no overreaching." *Id.*

██ If, however, there is neither full, frank, and truthful disclosure by the party seeking to enforce the agreement, nor "actual knowledge" by the party attacking the agreement, and if "the allowance made to the one who waives is unfairly disproportionate to the worth of the property involved at the time the agreement is made," then the validity of the agreement "must be tested by other standards." *Hartz,* 248 Md. at 57–58, 234 A.2d 865. Since the "real test" in determining the validity of a prenuptial agreement is whether there was "overreaching," the Court of Appeals has set forth a two-pronged test, derived from the definition of "overreaching" itself, a test which requires the court to ask, first, "was the benefit to [the party attacking the agreement] commensurate with that which she relinquished so that the agreement was fair and equitable under the circumstances," and, second, "did the subsequent would-be repudiator of the contract enter into the agreement freely and understandingly." *Id. Accord Cannon,* 384 Md. at 568–69, 865 A.2d 563. As the first prong of this "overreaching" test addresses the substantive fairness of the prenuptial agreement, while the second prong addresses the manner in which the repudiating party's assent to that agreement was obtained, we shall refer to the first of the two prongs as the "substantive prong" and the second as the "procedural prong."

Although the agreement in question does not reach the heights of a full, frank, and truthful disclosure of all of Mr. Stewart's assets, failing, as it does, to specify the value of each asset or their collective worth, it does, with one minor exception (an exception amounting to only three percent of his total assets), set forth all of Mr. Stewart's assets. And, given the number and nature of those assets (which, we stress, were not just numbered bank and investment accounts), it would have surely alerted Ms. Stewart that, by executing the agreement,

she would be waiving any claim she might have to assets worth thousands of dollars.

Nor can Ms. Stewart rely on any claim that she did not review the agreement, as the court found that "she read through" the prenuptial agreement; that she "knew what it said"; and, lastly, that she "was familiar with" the "major assets that the document list[ed]." Indeed, the court observed that Ms. Stewart had admitted that she was "aware of the farm on 231," a fifty-acre enterprise, and of Mr. Stewart's "concrete business," two of Mr. Stewart's most valuable assets, a not unreasonable conclusion given that the parties had lived together for a year before their marriage.

In sum, although Ms. Stewart did not receive notice of the specific value of each asset or of their collective worth, she did unquestionably receive what amounted to, for all intents and purposes, just shy of a complete list of those assets via the agreement and knew of the existence, nature, and potential worth of the most valuable of Mr. Stewart's assets before she ever signed the prenuptial. And finally, we note that there is no indication, that, had she requested additional information as to the value of the assets, such information would not have been forthcoming. In short, the agreement plus Ms. Stewart's actual knowledge of Mr. Stewart's principal assets put her on notice that she was, in fact, about to execute a waiver of any claims she might have to substantial assets.

Nonetheless, out of an abundance of caution, we shall, for the moment, assume that she did not receive anything that came close to full disclosure of Mr. Stewart's assets or have adequate knowledge of their existence or value and turn to the two-pronged "overreaching" test, that is whether, even if there was neither full, frank, and truthful disclosure of the parties' assets nor a substitute for such disclosure, the prenuptial agreement is still valid and enforceable because the benefit to the party attacking it was "commensurate with that which she relinquished so that the agreement was fair and equitable under the circumstances" and because "the subsequent would-be repudiator of the contract" entered into the agreement

"freely and understandingly." *Hartz,* 248 Md. at 58, 234 A.2d 865. *Accord Cannon,* 384 Md. at 568–69, 865 A.2d 563. Given what Ms. Stewart knew of Mr. Stewart's assets, before presentation of the agreement at issue, what she knew of the purpose and contents of the agreement, and the circumstances surrounding its execution, we find, under those "other standards," *Hartz,* 248 Md. at 58, 234 A.2d 865, that there was sufficient evidence to support the circuit court's conclusion that both the substantive and procedural prongs of the "overreaching" test were satisfied and that the agreement was, therefore, valid and enforceable.

### *"Overreaching" Test—Substantive Prong*

■ We begin with the substantive prong of the "overreaching" test, that is, whether the benefit to the waiving party is "commensurate with that which she relinquished so that the agreement was fair and equitable under the circumstances." *Hartz,* 248 Md. at 58, 234 A.2d 865. In that regard, we note that the agreement did not require Ms. Stewart to waive alimony or her right to a monetary award, to which she might be entitled under Family Law Article § 8–205. At the time the parties entered into the agreement, these potentially valuable rights were retained by Ms. Stewart.

■ Furthermore, Ms. Stewart's complaint that there was "no consideration ... other than marriage" to support the prenuptial agreement at issue is without merit. Though "consummation of the marriage is itself sufficient consideration" to support a prenuptial agreement, *Cannon,* 384 Md. at 553, 865 A.2d 563, the marriage also conferred upon Ms. Stewart potential economic benefits of a substantial nature, assets she did not waive under the prenuptial agreement, namely, the right to receive alimony and a monetary award upon the dissolution of that marriage.[4]

---

4. That the rights Ms. Stewart retained under the prenuptial agreement ultimately proved to have considerable value was later confirmed when the parties entered into the property settlement and separation agreement. That settlement agreement provided, among other things, that,

In sum, there was a sufficient factual basis for the circuit court's holding that, in the words of *Hartz*, the agreement was "fair and equitable under the circumstances." 248 Md. at 58, 234 A.2d 865.

### "Overreaching" Test—Procedural Prong

■ We turn next to the procedural prong of the "over-reaching" test: whether "the subsequent would-be repudiator of the contract" entered into the agreement "freely and understandingly." *Hartz*, 248 Md. at 58, 234 A.2d 865. To answer this question, we begin with a brief summary of the circumstances surrounding the formation of the agreement at issue.

When Ms. Stewart and Mr. Stewart met, two years before they married, she was a single, twenty-six-year-old high school dropout, who was working for minimum wage at a daycare center and whose principal asset was a car worth approximately $500; while he was a married, twenty-four-year-old high school graduate, with three children, who earned "around $100,000 a year" and had acquired a net worth of some $2.5 million through his construction business and related investments.

They began an extramarital affair which ultimately led to Mr. Stewart's divorce from his first wife. While that divorce was pending, the parties lived together for "a little more than a year." When Mr. Stewart's divorce was at hand, he and Ms. Stewart made plans for their wedding. At that time, notwithstanding the demands of the recent settlement he had reached with his former wife, Mr. Stewart's net worth was approximately $2 million.

---

in exchange for Ms. Stewart's "waiver of a demand for alimony, maintenance, or support," Mr. Stewart was required to pay her $175,000; and, in exchange for Ms. Stewart's release of claims against Mr. Stewart for the marital property that was not subject to the prenuptial agreement, he was required to pay her $387,500, tax free. Thus, in fact, Ms. Stewart ultimately received $562,500 which was directly attributable to the rights she retained under the prenuptial agreement. Indeed, Ms. Stewart leaves the marriage having received assets worth at least $1.2 million, after accounting for the division of marital property.

Given that his marriage to Ms. Stewart might prove to be no more successful than his first, Mr. Stewart insisted upon a prenuptial agreement as a precondition to marrying Ms. Stewart.[5] After Mr. Stewart's attorney drafted the agreement at issue, Mr. Stewart presented it to Ms. Stewart and asked her to sign it. According to Ms. Stewart, that presentation took place four days before the wedding, and Ms. Stewart felt, in her words, "a lot of pressure" to sign it. She said that, when she was given the agreement, Mr. Stewart told her to "sign it" or else "he wasn't gonna marry [her]." She complied with that condition because, as she put it: "I felt, you know, I love him, I cared about him, so I signed it." That admission led the court to later conclude: "the substance of the agreement ... didn't matter an awful lot to her because her position was she loved him, she was gonna marry him regardless."

Ms. Stewart testified that, at the time she signed the agreement, she was not represented by counsel, that she did not "really" read the agreement, and that she did not know what she was signing, though she admitted that she "briefly looked in" the agreement and, from that brief review, learned that Mr. Stewart owned the assets listed therein. She conceded, moreover, that, when she and Mr. Stewart met, she knew that he was "in business," that he "owned Waldorf Concrete," and that she was "aware of the assets, as far as the farm and stuff like that." In any event, she maintained that she signed the prenuptial agreement, fifteen minutes after it was presented to her.

The circuit court found that, regardless of when Ms. Stewart signed the agreement, she had "three or four days" during which she could have sought counsel and that "she elected not to" do so. In fact, it appears that she willingly declined to seek any professional advice. Finally, there is no suggestion by her that she was discouraged from seeking such advice. Consequently, the circuit court did not err in concluding that

---

5. There was also evidence that Mr. Stewart was motivated, in part, by a desire to protect the interests of his three children from his previous marriage.

Ms. Stewart "elected not to" seek professional advice. Md. Rule 8–131(c).

In *Cannon v. Cannon, supra,* 384 Md. 537, 865 A.2d 563, as here, the party attacking the prenuptial agreement "did not avail herself of the opportunity to seek legal counsel" despite having had "at least several days" to examine the agreement in question. *Id.* at 578, 865 A.2d 563. In that case, the Court of Appeals declared that it was "loathe to craft a brightline rule where both sides are compelled to seek counsel prior to entering into an antenuptial agreement." *Id.* It was "enough" to tip the scales "in favor of the validity of the agreement," said the Court, that the attacking party "had the opportunity to seek counsel" and "was not discouraged" from doing so. *Id.*

Observing that Ms. Stewart had admitted that "she loved [Mr. Stewart]" and "was gonna marry him regardless," the circuit court found that "she chose to sign" the prenuptial agreement, or, in other words, that she entered into the agreement "freely." *Hartz,* 248 Md. at 58, 234 A.2d 865. Given the circuit court's finding that she would have signed the agreement regardless of the circumstances attending its formation, a finding that was not clearly erroneous, Ms. Stewart can hardly claim here that she was prejudiced by the allegedly brief period of time she was given to consider the agreement. *See* Brett R. Turner & Laura W. Morgan, *Attacking and Defending Marital Agreements,* § 10.02, at 394 (2d ed.2012) (noting that "if the shortness of time did not affect the attacking party's willingness to sign," prenuptial agreement "may still be enforceable").

As to whether Ms. Stewart also entered into the agreement "understandingly," *Hartz,* 248 Md. at 58, 234 A.2d 865, the circuit court found: that "she read through the thing"; that she "knew what it said"; that she "was familiar with" the "major assets that the document lists"; that she admitted being "aware of the farm on 231"; and that she was "aware of the concrete business" and where it was located. As to her claim that she did not know who owned the condominium units

in Waldorf Business Square, the court found that Ms. Stewart "read that in [the] document" itself. In other words, the court found, in effect, that Ms. Stewart entered into the agreement "understandingly," regardless of her protestations to the contrary. *Hartz*, 248 Md. at 58, 234 A.2d 865.

Moreover, since application of the two-pronged "overreaching" test presupposes "inadequate disclosure," *see Cannon*, 384 Md. at 560, 865 A.2d 563, it follows that where, as here, there was disclosure of Mr. Stewart's specific assets but inadequate disclosure of their value, the agreement may nonetheless be valid and enforceable. In the instant case, there was substantial disclosure, by Mr. Stewart, as well as substantial knowledge, by Ms. Stewart, of the assets which Mr. Stewart owned, at the time the parties entered into the prenuptial agreement. Indeed, there was more than sufficient evidence to support the circuit court's conclusion that Ms. Stewart knew of essentially all of the assets and that those assets were valuable. Although there was no finding, by the court, that she actually knew that those assets were worth $2 million at the time the agreement was entered (despite Mr. Stewart's assurances that she did), there was more than enough evidence that Ms. Stewart had actual knowledge of at least the number, nature, and potential value of Mr. Stewart's premarital assets. In any event, given the court's finding that Ms. Stewart would have signed the prenuptial agreement regardless of the circumstances attending its formation, she may not now claim that she was prejudiced by any purported lack of information. *Hartz*, 248 Md. at 58, 234 A.2d 865 (noting that if attacking party is not prejudiced by lack of information, he or she may not repudiate prenuptial agreement on that basis).

We also note that Ms. Stewart never claims that she did not know either the nature and purpose of the agreement or what rights she was surrendering. Indeed, as she admitted at the hearing below, she read, at the top of the first page of the agreement, that it was, indeed, a prenuptial agreement, and she further testified that Mr. Stewart had told her the purpose of that agreement—that "he wanted to protect himself."

We therefore conclude that the circuit court's finding that Ms. Stewart was not "hoodwinked or misled or threatened or pressured" was not clearly erroneous and that the procedural prong of *Hartz*, that the party challenging the agreement entered into it "freely and understandingly," was satisfied. *Cannon*, 384 Md. at 568–69, 865 A.2d 563 (citing *Hartz*, 248 Md. at 58, 234 A.2d 865).

As both the substantive and procedural prongs of *Hartz*'s "overreaching" test have been met, we conclude that there was no overreaching by Mr. Stewart in procuring Ms. Stewart's assent to the prenuptial agreement and that it was therefore valid and enforceable.

## II.

■■■ Ms. Stewart contends that the agreement in question was unconscionable, because it was "clearly one-sided" and was "disproportionate to the advantage of" Mr. Stewart, and because she signed it "without valuable consideration or understanding of what rights she was waiving." This contention is without merit.

An "unconscionable bargain or contract has been defined as one characterized by 'extreme unfairness,' which is made evident by '(1) one party's lack of meaningful choice, and (2) contractual terms that unreasonably favor the other party.'" *Walther v. Sovereign Bank*, 386 Md. 412, 426, 872 A.2d 735 (2005) (quoting *Black's Law Dictionary* 1560 (8th ed.2004)).

■■■ The first of these two "components," *see Doyle v. Finance America, LLC*, 173 Md.App. 370, 383, 918 A.2d 1266 (2007), known as "procedural unconscionability," concerns the "process of making a contract" and includes such devices as the use of "fine print and convoluted or unclear language," as well as "deficiencies in the contract formation process, such as deception or a refusal to bargain over contract terms." *Walther*, 386 Md. at 426–27, 872 A.2d 735 (citations and quotations omitted). The second component, "substantive unconscionability," refers to contractual terms that are "unreasonably" or "grossly" favorable to the more powerful party

and includes terms "that attempt to alter in an impermissible manner fundamental duties otherwise imposed by the law," provisions "that seek to negate the reasonable expectations of the nondrafting party," and terms "unreasonably and unexpectedly harsh ... having nothing to do with ... central aspects of the transaction." *Id.* (citations and quotations omitted).

"The prevailing view is that both procedural and substantive unconscionability must be present in order for a court to invalidate a contractual term as unconscionable." *Freedman v. Comcast Corp.*, 190 Md.App. 179, 207–08, 988 A.2d 68 (2010). The burden of establishing the presence of both is on the party challenging the prenuptial agreement. *Cannon*, 384 Md. at 554, 865 A.2d 563. Moreover, unconscionability of a prenuptial agreement is determined as of "the time the contract was entered." *Id.*

Furthermore, according to a noteworthy authority, it "requires a greater showing of inappropriateness" to prove that a prenuptial agreement is unconscionable than it does to show that it is invalid under the "fair and reasonable" test, which it deems to be the same as Maryland's "overreaching" test. *See* Alexander Lindey & Louis I. Parley, *Lindey and Parley on Separation Agreements and Antenuptial Contracts*, § 110.66[1] at 110–57 & n. 3; *id.* § 110.66[2] at 110–59 (2d ed. 1999 & 2012 Supp.). *Accord* Barbara Ann Atwood, *Ten Years Later: Lingering Concerns About the Uniform Premarital Agreement Act*, 19 J. Legis. 127, 138 (1993) (stating that "conscionability" standard is "more deferential" than "fair" and "equitable" standard—the latter being the same as the Maryland "overreaching" standard, *see Cannon*, 384 Md. at 573, 865 A.2d 563). Having just determined that there was no overreaching by Mr. Stewart, we may conclude, on that ground alone, that the parties' prenuptial agreement was not unconscionable.

Moreover, there was no basis upon which the circuit court could have found, in the instant case, either procedural or substantive unconscionability, based upon what Ms. Stewart

has alleged. As for procedural unconscionability, Ms. Stewart claims only that Mr. Stewart told her that he would not marry her unless she signed the prenuptial agreement and that she "really didn't know" what she was signing. Notably absent from her brief is any allegation of "fine print," "convoluted or unclear language," "deception," or "a refusal to bargain over contract terms." *Walther*, 386 Md. at 426–27, 872 A.2d 735. And for good reason, as the agreement does not, on its face, suffer from either of the first two defects, and, as for the latter two, Ms. Stewart has never alleged that Mr. Stewart deceived her into signing the prenuptial, and she concedes[6] that she never attempted to bargain over its terms, though she had, according to her own testimony, four days to do so. Consequently, there was no procedural unconscionability.

As for substantive unconscionability, we note the prenuptial agreement was only applicable to property and did not preclude Ms. Stewart from receiving either alimony or a monetary award upon divorce.[7] Consequently, her waiver of her interest in certain enumerated properties,[8] owned by Mr. Stewart, hardly amounts to substantive unconscionability.

We find further support for this conclusion in *Martin v. Farber*, 68 Md.App. 137, 510 A.2d 608 (1986), the leading Maryland authority applying the doctrine of unconscionability to the subject of prenuptial agreements. In that case, we considered whether an "otherwise valid" prenuptial agreement could be set aside on the ground that its enforcement would be unconscionable, and we concluded that it could not. *Id.* at 143–45, 510 A.2d 608. The husband, Morris W. Farber,

---

**6.** At the hearing below, Ms. Stewart simply stated that there were no negotiations.

**7.** Of course, by limiting the scope of what might otherwise be or become marital property, the prenuptial agreement tended to limit the amount of a future monetary award.

**8.** As noted earlier, the agreement also provided that each party waived any interest in the other's property acquired "at any time thereafter," but Ms. Stewart has not challenged either the validity or enforceability of that provision.

although "steadily employed as an electrician, had no accumulated wealth at the time of his marriage to Mrs. Farber." *Id.* at 139, 510 A.2d 608. The wife, the former Nettie Sue Goldberg (and soon-to-be Mrs. Farber), had previously been married to a Dr. Chester Goldberg and had inherited substantial assets upon his death. *Id.* To retain ownership and control over those assets, no matter what the future held, the future Mrs. Farber asked her intended to sign a prenuptial agreement, three days before their marriage, which provided, "in essence, that Mrs. Farber would retain sole control of the property she acquired either prior to or during the marriage" and that "Mr. Farber relinquished all rights in the property and estate of Mrs. Farber." *Id.*

During their ensuing forty-four year marriage, Mr. Farber remained steadily employed until his retirement, in 1967, and, during that employment, regularly "turned his paychecks over to his wife," as she "managed the couple's household and financial affairs." *Id.* Mrs. Farber, for her part, gave Mr. Farber "repeated assurances" that she "would take care of him." *Id.* at 146, 510 A.2d 608. Unfortunately, according to the court, she "abused" the couple's confidential relationship[9] by using Mr. Farber's "earnings to acquire assets which she titled or placed solely in her own name." *Id.*

In 1983, Mrs. Farber died intestate. By the time of her death, "she had accumulated in her own name assets valued at approximately $275,000." *Id.* at 140, 510 A.2d 608. Mr. Farber was thereafter appointed, by the orphans' court, as the personal representative of Mrs. Farber's estate. Unhappy with that appointment, Mrs. Farber's grandchildren filed a petition seeking his removal from that position on the ground

---

9. Admittedly, the confidential relationship analyzed in *Martin v. Farber*, 68 Md.App. 137, 146, 510 A.2d 608 (1986), which arose during the marriage, is distinct from the confidential relationship we are considering here, which is presumed to exist, as a matter of law, between the parties who, not yet married, enter into a prenuptial agreement. In contrast, a confidential relationship arising during a marriage is not presumed to exist as a matter of law, but rather, is a question of fact. *See Cannon v. Cannon*, 384 Md. 537, 570–72, 865 A.2d 563 (2005).

that, under the prenuptial agreement, he had "renounced any claim to Mrs. Farber's estate." *Id.* Mr. Farber responded to that petition by filing a declaratory judgment action in the circuit court, in which he contended that the prenuptial agreement was invalid and that he was entitled to a spousal share of Mrs. Farber's estate, under Estates and Trusts Article, § 3–102.[10]

At the conclusion of a bench trial, the circuit court observed that, although Mr. Farber had "released any claim that he might have [had]" to his deceased wife's estate, "after some forty-four years of a seemingly happy marriage, in which [Mr. Farber] [had] turned everything he earned over to [Mrs. Farber] without question, and also upon her assurances that she would take care of [him], it would not only be unjust, but unconscionable for the court to enforce" the agreement. 68 Md.App. at 140, 510 A.2d 608. It therefore imposed a constructive trust upon Mrs. Farber's estate, "for the benefit of Mr. Farber during his life; the remainder to be distributed equally to Mrs. Farber's heirs." *Id.*

Affirming in part and reversing in part that decision, this Court held that the circuit court had "erred in ruling that the agreement was unconscionable" because it had "palpably relied on circumstances arising after the execution of the agreement" and not "as of the time [the agreement] was made." *Id.* at 144, 510 A.2d 608. We noted that "[n]othing in the Farbers' antenuptial agreement or in the circumstances surrounding its execution render[ed] it unconscionable or otherwise legally objectionable" and that, "[n]o matter how disturbing" Mrs. Farber's behavior during the marriage was, it did not afford "an adequate basis" for ruling that the agreement at issue was unconscionable. *Id.* at 144–45, 510 A.2d 608. We did, however, uphold the imposition of a constructive trust upon Mrs. Farber's estate, though we limited it "to the extent

---

10. That provision provides that the spousal share, "[i]f there is no surviving minor child, but there is surviving issue," is "the first $15,000 plus one-half of the residue" of the deceased spouse's estate. Md.Code (1974, 1986 Cum.Supp.), § 3–102(c) of the Estates and Trusts Article. An identical provision now appears in the 2011 Replacement Volume.

Mr. Farber [was] able to trace his funds into his late wife's estate." *Id.* at 147, 510 A.2d 608.

As in *Farber*, the prenuptial agreement, in the instant case, was executed just a few days before the marriage. In both cases, the agreement provided that the party seeking to enforce the agreement "would retain sole control of the property" he or she acquired "either prior to or during the marriage" and that the non-enforcing party "relinquished all rights in the property and estate of" the party seeking enforcement. *Id.* at 139, 510 A.2d 608. Moreover, in both cases, the party seeking enforcement entered into the marriage with substantial assets, while the party opposed to that enforcement did not. *Id.* In light of *Farber*, we conclude that the terms of the prenuptial agreement before us were neither unconscionable nor "otherwise legally objectionable." *Id.* at 144, 510 A.2d 608.

**JUDGMENT OF THE CIRCUIT COURT FOR CHARLES COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**