*Bruce Nouri v. Shabnam Dadgar*, No. 585, September Term, 2018; *Mohammad Ghazirad v. Fatemeh Mojarrad*, No. 2273, September Term, 2018.  Opinion by Fader, C.J.

**CONSTITUTIONAL LAW — FIRST AMENDMENT — RELIGIOUS CONTRACTS**

Provisions in religious marriage contracts may be enforced by a Maryland court if, but only if, their secular terms are enforceable under neutral principles of contract law.

**FAMILY LAW — RELIGIOUS CONTRACTS — CONFIDENTIAL RELATIONSHIP**

For the provisions in Islamic marriage contracts known as *mahrs*, the correct neutral principles to apply are those governing the enforcement of contracts entered into by parties in a confidential relationship (such as premarital agreements).

**FAMILY LAW — RELIGIOUS CONTRACTS — CONFIDENTIAL RELATIONSHIP**

The party seeking to enforce a *mahr* bears the burden to show that the *mahr* is an enforceable contract and that it is not tainted by overreaching (i.e., that in the atmosphere and environment of the confidential relationship there was no unfairness or inequity in the result of the agreement or its procurement).

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

Nos. 585 & 2273

September Term, 2018

———————————————————————

BRUCE NOURI

v.

SHABNAM DADGAR

———————————————————————

MOHAMMAD GHAZIRAD

v.

FATEMEH MOJARRAD

———————————————————————

Fader, C.J.,
Meredith,
Shaw Geter,

JJ.

———————————————————————

Opinion by Fader, C.J.

———————————————————————

Filed: April 7, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

These two cases, consolidated for purposes of this opinion, present the same issue of first impression in Maryland: May a civil court adjudicating a divorce enforce a provision in a religious marriage contract that requires one spouse to make a payment to the other?[1] We hold that a Maryland court may enforce such a provision only if, under secular legal principles, the contract satisfies the requirements of an agreement entered into by parties in a confidential relationship. That is, (1) "the burden of proof . . . falls upon the party seeking to enforce the agreement," *Cannon v. Cannon*, 384 Md. 537, 573 (2005); and (2) "[t]he correct standard for determining the validity of [the] agreement . . . [is] whether there is an 'overreaching, that is, whether in the atmosphere and environment of the confidential relationship there was unfairness or inequity in the result of the agreement or procurement,'" *id.* (quoting *Hartz v. Hartz*, 248 Md. 47, 57 (1967)). We will vacate the judgments and remand both cases so that the Circuit Court for Montgomery County may determine whether the parties' agreements meet that heightened standard.

## BACKGROUND

Each of the couples in these consolidated cases was married in both a civil ceremony and an Islamic religious ceremony. In connection with the Islamic ceremonies, each of the couples entered a marriage contract that contains a *mahr*, a provision that, as relevant here, required each of the husbands to pay a quantity of gold coins to each of the wives. The

---

[1] This opinion focuses exclusively on the enforceability of such a provision—here, a *mahr*—under Maryland civil law. We do not offer any opinion regarding the enforceability of a *mahr* under Islamic law or under the law of any country that has incorporated Islamic jurisprudence into its civil law. *Cf. Aleem v. Aleem*, 404 Md. 404, 406 n.1 (2008).

enforceability of those *mahrs* is the sole issue in each of these appeals. To provide context for our analysis, we will first explore what a *mahr* is and then turn to the facts of the two cases on appeal.

### *The* **Mahr**[2]

All four of the parties in these cases are of Iranian descent, and their Islamic marriages were inspired by practice in Iran. Marriage in Islam is a contractual undertaking, the basic elements of which are offer, acceptance, and *mahr*. *See* Jeanette Wakin, *Family Law in Islam*, *in* 9 Encylopædia Iranica 184-96 (2012), http://www.iranicaonline.org/articles/family-law (accessed Feb. 12, 2020). *Mahr* (also sometimes called *sadaqa*)[3] is "a sum of money or some other economically valuable asset that a husband must give to a wife." Nathan B. Oman, *How to Judge Shari'a Contracts: A Guide to Islamic Marriage Agreements in American Courts*, 2011 Utah L. Rev. 287, 302 (2011). *Mahr* is a religious obligation, prescribed by the Quran, that has been incorporated into the civil law of many Muslim countries, including Iran. *See* Ziba Mir-Hosseini, *Family Law in Modern Persia*, *in* 9 Encylopædia Iranica 184-96 (2012), http://www.iranicaonline.org/articles/family-law (accessed Feb. 12, 2020). A *mahr* also is included in the marriage contracts of many Muslim Americans who choose, like the couples in these cases, to be married in an Islamic marriage ceremony.

---

[2] The background presented in this section is derived from expert testimony presented in both cases and, where indicated, secondary sources.

[3] *Mahr* means "nuptial gift" in Arabic and other languages, whereas *sadaqa* means "charity." *See* Maulana Muhammad Ali, *The Religion of Islam* 323, 436 (4th ed. 2009).

2

A *mahr* may consist of "anything that has a value," such as currency, *see, e.g.*, *Aleem v. Aleem*, 404 Md. 404, 408 (2008) (*mahr* was 51,000 Pakistani rupees); *Seifeddine v. Jaber*, 934 N.W.2d 64 (Mich. Ct. App. 2019) (per curiam) ($50,000); *Aziz v. Aziz*, 488 N.Y.S.2d 123 (Sup. Ct. 1985) ($5,032), or, as in these cases, gold coins, a Quran, and a *hajj* trip. The precise nature and amount of the *mahr* varies in each contract. Every Islamic marriage contract must have a *mahr*, however, and if one is missing, then it will be implied. *See* Lindsey E. Blenkhorn, Note, *Islamic Marriage Contracts in American Courts: Interpreting Mahr Agreements as Prenuptials and Their Effect on Muslim Women*, 76 S. Cal. L. Rev. 189, 200 (2002).

The *mahr* is a personal obligation of the groom to the bride, which, "[g]enerally speaking[,] . . . is divided between an immediate gift to the wife" (the "prompt" or "immediate" *mahr*) "and a deferred payment." Oman, *supra*, at 291. In principle—or sometimes, under the explicit terms of the contract—the wife is entitled to the deferred *mahr* upon demand at any time following the marriage, and "any delay is a matter of contractual forbearance on her part." *Id.* at 302. In practice, though, "[s]uch delays are standard," and the deferred *mahr* typically becomes "due upon divorce or the husband's death." *Id.*; Wakin, *supra*; *see also, e.g.*, *Qureshi v. Qureshi* [1972] Fam. 173 [186] (Eng.) (noting that the "sadaqa in the instant case amounted to a promise by the husband on behalf of himself and his estate to pay to the wife the sum of 9,000 rupees . . . either (by agreement) on demand at any time or (perforce) on the dissolution of the marriage by divorce or death").

3

The parties' experts offered at least two explanations for the historical development of *mahr* in Islamic marriage contracts. Each explanation is grounded in features of Islamic law that differ from the law of Maryland. First, a *mahr* can operate as a disincentive for a husband to exercise his disproportionate power to divorce his wife without cause under Islamic law. Traditionally—and today, "where [ ] Islamic law has been adopted as the secular law of a jurisdiction"—"a husband has a virtual automatic right to *talaq*, []i.e., to divorce his wife by acknowledging 'I divorce thee' three times[]." *Aleem*, 404 Md. at 406 n.1. "[T]he wife only has a right to *talaq* if it is in the written marriage agreement or if [the husband] otherwise delegates that right to her." *Id.* Otherwise, she may obtain a divorce only with her husband's consent or for cause from an Islamic judge. If the husband invokes his right of *talaq*, however, then the *mahr* generally becomes payable immediately. *See* Wakin, *supra*; Oman, *supra*, at 305; *see also Aleem*, 404 Md. at 410 n.5 (characterizing a *mahr*, as described in a pleading filed in that case, "as a means of controlling the husband's power of divorce, since upon dissolution of the marriage he is requi[r]ed to pay the total amount of the [*mahr*] at once").

Second, because Islamic law does not recognize marital property, a *mahr* can provide a wife with some financial security in the event of divorce or the husband's death. Under traditional Islamic law, upon dissolution of a marriage, the wife is not entitled to a disposition of marital property, nor does she have any claim to alimony or child support. *See* Oman, *supra*, at 305-06. Absent operation of a civil law providing such rights, the *mahr* is thus the exclusive compensation payable to the wife upon divorce. *See* Akbar

4

Aghajanian, *Divorce in Modern Persia*, *in* 7 Encylopædia Iranica 443-51 (2011), http://www.iranicaonline.org/articles/divorce (accessed Feb. 12, 2020).

Although the governing laws in this country recognize marital property and do not recognize *talaq* divorces, many American couples continue to enter Islamic marriage contracts that contain *mahrs*. *See* Maha Alkhateeb, *Islamic Marriage Contracts: A Resource Guide for Legal Professionals, Advocates, Imams & Communities* 18-22 (2012), https://www.api-gbv.org/resources/islamic-marriage-contracts/ (accessed Feb. 12, 2020) (describing marital practices among Muslim Americans). That includes the two cases before us, as we now explain.

**Nouri v. Dadgar**

The appellant, Dr. Bruce Nouri, and the appellee, Dr. Shabnam Dadgar, were married in two separate ceremonies in October 2005. As found by the circuit court, "[t]he first ceremony took place in Iran; the parties participated from Northern Virginia by conference call, while relatives, an Ayatollah, and other government officials were present at the ceremony in Tehran. The second occurred at Montgomery County Circuit Court." The parties "agreed to a '*mahr*' on the day of the Iranian marriage ceremony." According to its English translation,[4] the *mahr* contained two components, a Quran, which was "handed to the bride" at the ceremony, "and a pledge of one thousand three hundred fifty-

_____

[4] The original marriage contract is written in Farsi. An English translation was submitted to the circuit court, and its accuracy was uncontested by the parties.

5

three (1353) full 'Spring of Freedom' gold coins[5] for which the husband is totally liable and shall hand them to the wife at any time she demands them."

In its written opinion, the court noted that no one at trial "testified in detail about the negotiation of the *mahr*." Dr. Dadgar and her father both testified that the parties had agreed on the amount of the *mahr*. Conversely, Dr. Nouri testified that he and Dr. Dadgar had not discussed the amount of the *mahr*, and his father testified that Dr. Dadgar's parents had demanded the amount. The court ultimately found only that "Dr. Dadgar stated that she discussed the *mahr* with Dr. Nouri and they agreed to the number of 1,353. It reflected the year of her birth on the Iranian calendar."

In March 2016, after the parties' marriage soured, Dr. Nouri filed a complaint for joint custody of the parties' children and child support. Dr. Dadgar counterclaimed for sole custody as well as support and maintenance for the children. Later, she amended her counterclaim to seek an absolute divorce.

During the pendency of the proceedings in Montgomery County, each party also initiated separate actions in Iran that were addressed, at least in part, to the validity of the *mahr*. Dr. Dadgar began proceedings in Iran to enforce the *mahr*, but she withdrew her filing shortly before her deposition in this case. Dr. Nouri filed a separate petition for an

---

[5] The "Spring of Freedom" (in Farsi, *Bahar Azadi*) coin is the official Iranian gold bullion coin. (The name refers to the season of the Iranian Revolution in 1979.) The value of each coin "is linked to the world price of [ ] gold." Leila Salarpour Goodarzi, *Mahr and Divorce: An Islamic Marriage Concept and Its Effects on Intrahousehold Bargaining Power of Couples*, 2d IZA Workshop: Gender and Family Economics n.2 (Apr. 20, 2018), http://conference.iza.org/conference_files/Gender_2018/salarpour_goodarzi_l26070.pdf (accessed Feb. 12, 2020). "In the past two decades, high inflation rates made the official gold coin one of the most popular currencies for mahr" in Iran. *Id.* at 4.

annulment in Iran, which included a request that the Iranian court cancel his obligation to pay the *mahr*. Dr. Dadgar did not participate in the annulment proceeding, and she testified before the circuit court that she was not aware of it at the time. The Iranian court eventually issued an ex parte order that annulled the parties' marriage, but held that Dr. Nouri remained obligated to pay Dr. Dadgar the *mahr*. According to a representation by Dr. Nouri's counsel during oral argument, his initial appeal from that ruling was unsuccessful, but he might be pursuing further appellate review of the decision in Iran.

The *mahr* first seems to have been raised explicitly in the Maryland proceedings in August 2017, when Dr. Nouri amended his complaint and asked the circuit court to "decree that the Islamic Marriage Contract is unenforceable." Dr. Dadgar responded by seeking leave to amend her counterclaim in early November, asking the court to "issue an order stating that the parties' Muslim Marriage Contract is valid and enforceable" and to "enter judgment in [Dr. Dadgar]'s favor . . . in the amount of $492,750.00 representing the fair market value of one thousand three hundred fifty three (1,353) full 'Spring of Freedom' gold coins." Dr. Nouri opposed Dr. Dadgar's motion for leave to amend her counterclaim, arguing that the amended counterclaim would be untimely and could lead to "inconsistent results" due to the "parallel proceedings in Iran." On the first day of trial, November 13, 2017, the circuit court granted Dr. Dadgar's motion. The court acknowledged that the amended counterclaim was "way out of time," but noted, "that's not unusual in these cases." The court concluded that the *mahr* was "part of what needs to be resolved."

Following a five-day trial, the court issued a Judgment of Divorce accompanied by a written opinion in which it discussed, among other things, the *mahr*. The court held that

7

the *mahr*, which the court valued at $492,750,[6] was a contractual obligation entered before marriage, not a prenuptial agreement; that it was enforceable under neutral principles of law; that it was not marital property; and that it did not violate Maryland law or public policy. The court therefore ordered Dr. Nouri to pay the full amount of the *mahr* to Dr. Dadgar.

**Ghazirad v. Mojarrad**

In *Ghazirad v. Mojarrad*, the appellant, Mohammad Ghazirad, and the appellee, Fatemeh Mojarrad, were married in multiple ceremonies. The first ceremony was a civil ceremony held on July 6, 2006 in Alabama. The second was an Islamic religious ceremony held on July 22, 2006 in Manassas, Virginia. During that second ceremony, the parties signed a one-page English language document entitled "Certificate of Marriage" that was supplied by the officiant of the ceremony, Abolfazl Nahidian, the Director of the Islamic Center of Manassas, Virginia. In addition to identifying the date of the ceremony, the bride and groom, and the dates and places of their birth, and providing places for signatures of the bride and groom and two witnesses, the document included the following sentence: "The Sadaq being *500 Gold Coin, Hajj, QUR'AN* of which *QURAN* advanced and *500 Coin & Hajj* postponed."[7] The circuit court found that this *mahr* "entitled [Ms. Mojarrad]

---

[6] As the court noted, "[t]he parties were at odds about the dollar value of the *mahr*." Although we cannot identify precisely how the court calculated the value of the *mahr*, Dr. Nouri has not challenged the valuation on appeal.

[7] In the original document, the text that appears here in roman characters is typed and the text in italics here is handwritten.

to Five Hundred Gold Coins," worth "approximately Four Hundred and Fifty Dollars ($450) each," "and a *hajj* trip," which the court valued at between $5,000 and $10,000.[8]

---

[8] The parties also participated in a third event in Iran in 2007. Although Ms. Mojarrad alleges that this was a third wedding ceremony, Mr. Ghazirad contends it was merely a reception. Ms. Mojarrad asserts that the parties signed a second, much more specific *mahr* at this third event. Approximately one week before trial, Ms. Mojarrad produced for the first time a copy of the Farsi marriage contract that she claims the parties signed in Iran. At trial, Mr. Ghazirad's counsel contended that an English translation Ms. Mojarrad had obtained was "incomplete." During the testimony of Ms. Moharrad's Islamic law expert witness, the court suggested that the parties "have the witness just talk about the Farsi version." Ms. Mojarrad's counsel accordingly asked her expert to translate part of the document from the witness stand, which he did as follows:

> [T]he sadaq, which is, again, is a mahr, is one book of God, the Quran, and then, and then there is a 100,000 rials, and then, included with mirror and some lighters and also one ring, 5,000,000 rials, that already given to her, and she confessed that, and then there are 500 coin in the name of (unintelligible), freedom, (unintelligible) freedom. That's a kind of Iranian, a very famous one. . . . In addition to one pilgrimage trip that is on his shoulder, and when, ende-al-mutalebeh, the one which I said, when it is asked for, then he has to give it to the wife. That's the translation.

Mr. Ghazirad denied that the parties signed a second *mahr* and objected to the introduction of the late-produced Farsi document. The court admitted the purported second *mahr* into evidence but "recognize[d] there[ was] some disagreement" regarding its authenticity. In its written opinion, the court noted the parties' disagreement but did not make any findings of fact regarding whether the Iranian event was a third wedding ceremony or whether the parties entered a second *mahr*.

The alleged second *mahr* is more specific than the first in several respects, two of which relate to the parties' claims. First, whereas the Virginia *mahr* refers only to "gold coin," the alleged Farsi *mahr*, as translated and described, references a "very famous . . . gold" Iranian "freedom" coin, which the court found was the Spring of Freedom gold bullion coin. That difference appears not to have played a role in the court's decision, insofar as the court stated that it relied on testimony, and not the Farsi *mahr*, to identify the value of the coins referenced in the Virginia *mahr*. Second, whereas the Virginia *mahr* does not identify any payment terms, the Iranian *mahr*, as translated and described, states that payment is due "when it is asked for." It is unclear whether the court relied on the Farsi *mahr*'s provision regarding the timing of the payment obligation. To the extent that is relevant to the court's decision on remand, the court will clarify that point.

9

The circuit court did not make any explicit findings of fact regarding the negotiation of the *mahr* agreement. At trial, the parties offered contradictory testimony regarding how they arrived at the amount of the *mahr* and why they entered the Islamic marriage. Ms. Mojarrad testified that it was Mr. Ghazirad who "suggested the amount of the 500 [ ] coins" in "April of 2006," and that they "both agreed to it mutually." She stated that Mr. Ghazirad's parents preferred a lesser amount, but that Mr. Ghazirad "want[ed] to just do the 500." Ms. Mojarrad testified that she entered into the *mahr* because "[i]t's pretty much a custom in the Iranian culture to have a mahr when you're getting married. So, it's a cultural thing." She also testified that the parties entered the Islamic marriage primarily because Mr. Ghazirad's "parents demanded it."

Conversely, Mr. Ghazirad testified that Ms. Mojarrad's parents determined the amount of the *mahr*, and that although the two sets of parents discussed it before the ceremony, the parties themselves "did not discuss it." He also claimed that the *hajj* provision "was introduced by Mr. Nahidian" at the wedding, but he acknowledged that he agreed to it. In addition, Mr. Ghazirad acknowledged that he and Ms. Mojarrad discussed getting married Islamically before the civil marriage; that his parents consulted with him with regard to the *mahr*; that "there was [a] discussion about the gold coin[s]," specifically, "[a]bout the number"; and that he had agreed to the amount.

In April 2017, after the parties' marriage collapsed, Ms. Mojarrad filed a complaint for absolute divorce. Among other relief, Ms. Mojarrad asked the court to enforce the *mahr*. Mr. Ghazirad answered and filed a countercomplaint for absolute divorce. Unlike in *Nouri*, neither party initiated any proceedings in Iran. The trial judge—who was the

10

same judge who had decided *Nouri* three months earlier—held that the *mahr* was enforceable under neutral principles of law; that it was not marital property; and that it did not violate Maryland law or public policy. The court therefore ruled that Ms. Mojarrad was entitled to receive $225,000, the value the court assigned to the gold coins, from Mr. Ghazirad.[9]

## DISCUSSION

On appeal from the bench trials in these cases, we "review the case on both the law and the evidence." Md. Rule 8-131(c). We "will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." *Id.* "'Th[at] means that we may not substitute our judgment for that of the fact finder, even if we might have reached a different result,' absent an abuse of discretion." *Gordon v. Gordon*, 174 Md. App. 583, 626 (2007) (quoting *Innerbichler v. Innerbichler*, 132 Md. App. 207, 230 (2000)). "[U]nder an abuse of discretion standard . . . 'appellate courts will accord great deference to the findings and judgments of trial judges, sitting in their equitable capacity, when conducting divorce proceedings.'" *Karmand v. Karmand*, 145 Md. App. 317, 326 (2002)

---

[9] The Judgment of Divorce directs Mr. Ghazirad to "pay to [Ms. Mojarrad] Four Hundred and Fifty Spring of Freedom Gold coins ($225,000) (the *mahr*)," which reflects the value in U.S. currency of five hundred coins worth $450 each. At trial, Ms. Mojarrad's expert testified that each Spring of Freedom coin was "on the market [for] around 19 million rial," or "[a]round 450 U.S. dollars per coin." Mr. Ghazirad objected to that testimony as beyond the witness's expertise, and the court overruled the objection. On appeal, Mr. Ghazirad appears to acknowledge that the circuit court intended to order him to pay the equivalent in U.S. currency of five hundred gold coins, and he has not challenged the clarity of the court's judgment in that respect or the valuation it placed on each Spring of Freedom coin.

11

(quoting *Tracey v. Tracey*, 328 Md. 380, 385 (1992)). Still, the "trial court must exercise its discretion in accordance with correct legal standards." *Gordon*, 174 Md. App. at 626 (quoting *Alston v. Alston*, 331 Md. 496, 504 (1993)). To the extent that the decision "involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the [trial] court's conclusions are 'legally correct' under a *de novo* standard of review."[10] *L.W. Wolfe Enters. v. Md. Nat'l Golf*, 165 Md. App. 339, 344 (2005) (quoting *Walter v. Gunter*, 367 Md. 386, 392 (2002)).

## I. IF THESE *MAHRS* QUALIFY AS VALID AGREEMENTS UNDER "NEUTRAL PRINCIPLES OF LAW," THEN THEY MAY BE ENFORCED WITHOUT VIOLATING THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION.

Dr. Nouri and Mr. Ghazirad have challenged the enforceability of the *mahrs* on several grounds, including under the Free Exercise Clause of the First Amendment to the United States Constitution.[11] They argue that the *mahrs* cannot be enforced without

---

[10] Although each of these cases might have presented choice-of-law issues, we "exercise our discretion [to] apply the law of our State" because, at least before us, all parties in both cases have "proceeded on the assumption that Maryland law governs." *See Cain v. Midland Funding*, 452 Md. 141, 151 n.9 (2017). In neither case has any party asked us to apply the law of a different jurisdiction to determine the enforceability of the *mahrs* in a Maryland court.

At trial in *Nouri*, Dr. Nouri argued that "[i]f [Dr. Dadgar] had filed initially to [enforce the *mahr*] here," then the parties "would essentially be . . . pleading Iranian law . . . as to whether or not . . . she is entitled to the Mahr," and "the Court would actually almost had to [have] s[a]t as an Iranian court to make those determinations under Iranian law." We do not think that statement, phrased as a hypothetical, constituted a request for the trial court to apply Iranian law. In any event, Dr. Nouri does not argue on appeal that the trial court erred in applying Maryland law.

[11] Article 36 of the Maryland Declaration of Rights provides a unique, additional guarantee of religious freedom, but Dr. Nouri and Mr. Ghazirad have not invoked the protection of that provision and have limited their arguments to the First Amendment. We therefore confine our analysis to the federal constitutional right.

12

interpreting religious doctrine, a function that the Free Exercise Clause forbids secular courts to perform. Dr. Dadgar and Ms. Mojarrad respond that the *mahrs* do not offend the Free Exercise Clause because they may be enforced as secular contracts under "neutral principles of law."

We agree with Dr. Dadgar and Ms. Mojarrad that *mahrs* may, in principle, be enforced as secular contracts *if* they are enforceable under neutral principles of contract law. In other words, if the secular terms of a *mahr* would satisfy all the elements of an equivalent civil contract, then a Maryland court may enforce the *mahr* notwithstanding the religious context in which it was entered. We also hold, however, that because both of the contracts before us were entered in contemplation of marriage, the applicable secular legal framework is that governing agreements entered into by parties in a confidential relationship. *See generally Cannon v. Cannon*, 384 Md. 537 (2005). Thus, a Maryland court may enforce a *mahr* without violating public policy only if the *mahr* constitutes a valid contract between parties in a confidential relationship.

### A. Civil Courts May Resolve Secular Disputes that Arise in Religious Contexts Provided that They Are Able to Do So by Applying "Neutral Principles of Law."

The First Amendment, as applied to the states through the Fourteenth Amendment, *see Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), provides that each State "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof," U.S. Const., amend. 1. "The first of the two Clauses, commonly called the Establishment Clause, commands a separation of church and state. The second, the Free Exercise Clause, requires government respect for, and noninterference with, the religious

13

beliefs and practices of our Nation's people." *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005).

"The Supreme Court has held that both the Free Exercise and Establishment Clauses of the First Amendment prohibit judicial review of religious questions," *Lang v. Levi*, 198 Md. App. 154, 169 (2011), lest the courts stumble into a "theological thicket," *Mt. Olive AME Church v. Bd. of Incorporators of AME Church*, 348 Md. 299, 309 (1997) (quoting *Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg*, 249 Md. 650, 660 (1968), *vacated*, 393 U.S. 528 (1969), *reaff'd on remand*, 254 Md. 162 (1969), *appeal dismissed*, 396 U.S. 367 (1970)). In particular, "the First Amendment prohibits civil courts from resolving . . . disputes on the basis of religious doctrine and practice." *Jones v. Wolf*, 443 U.S. 595, 602 (1979). Not only must courts refrain from "adjudicat[ing] matters of church doctrine or governance," *Downs v. Roman Catholic Archbishop of Balt.*, 111 Md. App. 616, 622 (1996), but they must also avoid deciding secular cases in ways that might lead to "entanglement in questions of religious doctrine, polity, and practice," *From the Heart Church Ministries v. AME Zion Church*, 370 Md. 152, 179 (2002) (quoting *Jones*, 443 U.S. at 603).

The First Amendment does not "proscrib[e] all inquiry by a court of church disputes, but only those dealing with 'questions of discipline, or of faith, or ecclesiastical rule, custom, or law.'" *Mt. Olive AME Church*, 348 Md. at 311 (quoting *Calvary Presbyterian Church of Balt. City v. Presbytery of Balt. of United Presbyterian Church in U.S.*, 39 Md. App. 405, 417 (1978) (quoting *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727-29 (1871))). Indeed, it might itself violate the Amendment for a court to refuse to adjudicate a matter

14

simply because it arose in a religious context or in a document with religious origins. *See, e.g.*, *Trinity Lutheran Church of Columb. v. Comer*, __ U.S. __, 137 S. Ct. 2012, 2021 (2017) ("The Free Exercise Clause protects against laws that 'impose[ ] special disabilities on the basis of . . . religious status.'" (quoting *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 532 (1993))); *McDaniel v. Paty*, 435 U.S. 618, 626 (1978) (the Free Exercise Clause prohibits "depriving [people] of a civil right solely because of their religious beliefs"); *see also Bd. of Educ. v. Grumet*, 512 U.S. 687, 717 (1994) (O'Connor, J., concurring in part and concurring in the judgment) ("The Religion Clauses prohibit the government from favoring religion, but they provide no warrant for discriminating *against* religion."). Therefore, civil courts may resolve disputes that arise in religious contexts "so long as the relevant inquiry is whether the question can be decided 'on the basis of neutral principles of law which do not involve the resolution by the court of ecclesiastical issues,' or doctrinal proprieties." *Mt. Olive AME Church*, 348 Md. at 312 (quoting *Calvary Presbyterian Church*, 39 Md. App. at 417).

The Court of Appeals has defined "neutral principles of law" as "principles that are 'applicable not only to religious bodies, but to public and private lay organizations and to civil governments as well.'" *From the Heart Church Ministries*, 370 Md. at 180 (quoting *Kennedy v. Gray*, 807 P.2d 670, 676 (Kan. 1991)). They may include, for example, "principles of the common law," *id.* (quoting *Moses v. Diocese of Colorado*, 863 P.2d 310, 320 (Colo. 1993)) (emphasis removed), as well as "the ordinary indicia of property rights," *From the Heart Church Ministries*, 370 Md. at 181 (quoting *Serbian Orthodox Church v. Kelemen*, 256 N.E.2d 212, 215 (Ohio 1970)).

15

Of course, the appropriate "neutral principles" to apply will vary with the subject matter of the case. In a property dispute—the context in which the "neutral principles of law" doctrine was first developed—courts turn to "objective, well-established concepts of trust and property law." *From the Heart Church Ministries*, 370 Md. at 179 (quoting *Jones*, 443 U.S. at 603). In a contract dispute, "neutral principles of law may be derived from a state's common law of contracts." *Seifeddine*, 934 N.W.2d at 69; *accord From the Heart Church Ministries*, 370 Md. at 181 (Some "disputes among members of a congregation . . . are not doctrinal disputes. Some are simply disputes as to the meaning of agreements on wills, trusts, contracts, and property ownership." (quoting *Presbytery of Beaver-Butler of United Presbyterian Church v. Middlesex Presbyterian Church*, 489 A.2d 1317, 1320-21 (Pa. 1985))); *see also Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 355 (D.C. 2005) (concluding that "the rules . . . governing the formation, interpretation, and enforcement of contracts . . . are 'neutral principles of law' that civil courts may apply" in deciding cases that arise out of a religious context). The crucial point is that the court must be able to "resolve the [] dispute on the basis of neutral principles of law which do not involve the resolution by the court of ecclesiastical issues." *Mt. Olive AME Church*, 348 Md. at 311 (quoting *Polen v. Cox*, 259 Md. 25, 30 (1970)); *see also Aleem*, 404 Md. at 406 n.1 (stating that the Court's holding regarding *talaq* divorces "only relates to instances where Islamic law, or parts thereof such as *talaq*, is also the secular (civil) law of a country whose judgments we are urged to accept under the doctrine of comity," and that "[t]he viability of Islamic law as a religious canon is not intended to be affected").

16

Thus, a *mahr* may be enforced by a Maryland court if, but only if: (1) it can be interpreted under "neutral principles of [contract] law," without court involvement "in any theological or doctrinal matter," *Am. Union of Baptists v. Trs. of Particular Primitive Baptist Church at Black Rock*, 335 Md. 564, 575-76 (1994); and (2) "scrutinize[d] . . . in purely secular terms," it constitutes an enforceable agreement, *see From the Heart Church Ministries*, 370 Md. at 187 (quoting *Jones*, 443 U.S. at 604).

By holding that a *mahr* is enforceable only if it may be construed without adjudicating matters of religious doctrine, we do not mean that a court must ignore entirely the context in which the agreement is made. To the extent that context surrounding the agreement informs the court's interpretation of its objective terms, a civil court may investigate that context in the same manner as it would for any other contract. *See Ocean Petrol. Co. v. Yanek*, 416 Md. 74, 88 (2010) ("We employ an objective approach to contract construction . . . by considering the plain language of the disputed provisions in context, which includes not only the text of the entire contract but also the contract's character, purpose, and 'the facts and circumstances of the parties at the time of execution.'" (quoting *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388 (1985))); *Della Ratta, Inc. v. Am. Better Cmty. Devs.*, 38 Md. App. 119, 130 (1977) ("Where the language of a contract is ambiguous or susceptible to different interpretations, the court . . . may consider evidence of such extrinsic factors as the negotiations of the parties, the circumstances surrounding execution of the contract, the parties' own construction of the contract and the conduct of the parties."). But the purpose in examining that context must be "shed[ding] light on the intentions of the parties," *see John L. Mattingly Constr. v. Hartford*

17

*Underwriters Ins.*, 415 Md. 313, 326 (2010) ("*Mattingly*") (quoting *Sy-Lene of Wash. v. Starwood Urban Retail II*, 376 Md. 157, 167-68 (2003)), not interpreting religious doctrine.

**B.** *Mahrs* **May Be Enforced Without Violating the First Amendment Provided that Their Secular Terms Satisfy the Requirements for Contracts Entered Into by Parties in a Confidential Relationship.**

Applying the "neutral principles of law" approach, we reject Dr. Nouri's and Mr. Ghazirad's argument that *mahrs*, in general, cannot be enforced without running afoul of the federal Constitution. That does not mean, of course, that all *mahrs* are enforceable. Instead, it means that the enforceability of any particular *mahr* will depend on whether its secular terms—construed according to the ordinary rules of contract interpretation—are enforceable under the applicable secular legal framework. On that point, we are fully in agreement with the Circuit Court for Montgomery County. Where we part ways with that court's analysis is in its identification of the applicable secular legal framework. Whereas the circuit court analyzed the *mahrs* as standard contracts between parties presumably operating at arm's length, we conclude that they are more appropriately considered under the more stringent standards applied to contracts entered into by parties in a confidential relationship. Before turning to that analysis, we discuss case law from other jurisdictions that have addressed this issue.

### i. *Courts in Other Jurisdictions Generally Agree that* **Mahrs** *May Be Enforced by Secular Courts Under Neutral Principles of Contract Law.*

Reported cases regarding the enforceability of *mahrs* are scarce, and reported opinions from our sister appellate courts even more so. Nevertheless, courts in other jurisdictions that have addressed the question generally have agreed that *mahrs* may be

18

enforced by secular courts to the extent that they are enforceable under neutral principles of contract law. The circuit court relied on two such opinions, one issued by a trial court in New Jersey, *Odatalla v. Odatalla*, 810 A.2d 93 (N.J. Super. Ct. Ch. Div. 2002), and the other issued by a trial court in New York, *Aziz v. Aziz*, 488 N.Y.S.2d 123 (Sup. Ct. 1985).

In *Odatalla*, a wife involved in a divorce proceeding sought specific performance of a $10,000 *mahr*. 810 A.2d at 307-08. The court determined that a *mahr* is enforceable if it meets a "two prong test": (1) the provision is "capable of specific performance under 'neutral principles of law,'" and (2) "once those 'neutral principles of law' are applied, the agreement in question meets the state's standards for those 'neutral principles of law.'" *Id.* at 313. Videotape evidence showed the parties and their families negotiating the amount of the *mahr* and then writing and signing the agreement, after which the groom gave the bride the nominal immediate payment. *Id.* at 308. Based on that evidence, the court held that the *mahr* was enforceable and not contrary to public policy because it was "nothing more and nothing less than a simple contract between two consenting adults." *Id.* at 314.

In *Aziz*, a New York trial court similarly enforced a *mahr* provision within the context of a divorce action, concluding that the *mahr*'s "secular terms [were] enforceable as a contractual obligation, notwithstanding that it was entered as part of a religious ceremony." 488 N.Y.S.2d at 124; *see also S.B. v. W.A.*, 959 N.Y.S.2d 802, 803 (Sup. Ct. 2012) (in holding that a foreign judgment enforcing a *mahr* was entitled to recognition, reasoning that "[s]ince a Mahr agreement may be enforced according to neutral principles of law, it will survive any constitutional challenge and be enforceable as a contractual obligation"), *aff'd sub nom. Badawi v. Wael Mounir Alesawy*, 24 N.Y.S.3d 683 (App. Div.

19

2016); *Akileh v. Elchahal*, 666 So. 2d 246, 248 (Fla. Dist. Ct. App. 1996) (applying "Florida contract law . . . to the secular terms of the sadaq" and holding that a *mahr* negotiated before marriage was a valid "antenuptial contract, executed in contemplation of a forthcoming marriage," with the marriage serving as valid consideration).

Other courts have agreed that *mahrs* may be enforceable under neutral principles of law, but, after applying those principles, have declined to enforce the particular *mahrs* before them. For example, in *In re Marriage of Obaidi & Qayoum*, Washington's intermediate appellate court agreed that the case could be resolved by treating the *mahr* as "a prenuptial agreement" and "[a]pplying the neutral principles of contract law." 226 P.3d 787, 788, 790 (Wash. Ct. App. 2010). The court held the *mahr* before it unenforceable, however, because "there was no meeting of the minds on the essential terms of the agreement." *Id.* at 791. The *mahr* had "no term promising to pay and no term explaining why or when the [amount of the *mahr*] would be paid." *Id.* In addition, the husband had not been told about the *mahr* until 15 minutes before the agreement was signed; the agreement was negotiated and written in Farsi, which he "d[id] not read, write, or speak"; and he had no "opportunity to consult with counsel." *Id.* The court therefore reversed the trial court's judgment enforcing the *mahr*. *Id.* at 792; *see also Ravasizadeh v. Niakosari*, 112 N.E.3d 807, 812-13 (Mass. App. Ct. 2018) (agreeing that "a *mahr* agreement may be enforced according to neutral principles of law" as a contractual obligation, but holding that "where the parties ha[d] submitted [the issue of the enforceability] to the jurisdiction of the Iranian courts," the court would "apply the rule of comity and not disturb the ruling of the Iranian courts"); *Ahmed v. Ahmed*, 261 S.W.3d 190, 194, 195-96 (Tex. Ct. App.

20

2008) (holding that a *mahr* was unenforceable as a premarital agreement under Texas law because it did not satisfy statutory requirements, but remanding for trial court to determine whether the agreement was otherwise valid).[12]

### ii. The Applicable Legal Framework to Determine the Enforceability of a **Mahr** *Is the Framework Applicable to Contracts Entered Into by Parties in a Confidential Relationship.*

Having concluded that a secular court may enforce a *mahr* if its secular terms are enforceable under neutral principles of contract law, we must now decide *which* neutral principles to apply. Dr. Dadgar and Ms. Mojarrad contend—and the circuit court agreed— that the proper legal framework to apply is that governing ordinary contracts between parties operating at arm's length. Conversely, Dr. Nouri and Mr. Ghazirad argue that the correct legal framework is the heightened standard governing premarital agreements. We hold that where parties agree to enter a *mahr* in contemplation of marriage, as occurred in these cases, they are presumed to be in a confidential relationship as a matter of law.

---

[12] In *In re Marriage of Turfe*, 233 Cal. Rptr. 3d 315 (Ct. App. 2018), *as modified on denial of reh'g* (June 8, 2018), California's intermediate appellate court also discussed the nature of a *mahr*. There, a husband requested an annulment based on his contention that his wife had committed fraud by representing that she would abide by the terms of a *mahr*. The *mahr* at issue provided for "5 Golden coins paid in advance and a copy of Quran deferred." *Id.* at 318 (internal footnote omitted). The husband argued that the deferred portion of the *mahr*—the Quran—was the sum total of what the wife agreed to accept if the parties divorced, and he alleged that she had committed fraud when she led him to believe that she would abide by that term. *Id.* Observing that "religious scholars disagree as to whether the consideration specified in the mahr agreement is the sum total of what wife may recover in the event of divorce," the appellate court affirmed the trial court's judgment that the "wife did not deceive husband with respect to her intentions in entering into the mahr agreement." *Id.* at 322.

21

Therefore, the agreements are enforceable only if they satisfy the requirements for the enforcement of agreements entered into by parties in a confidential relationship.

In determining which framework to apply to the *mahrs* in these consolidated cases, we are guided by the decision of the Court of Appeals in *Cannon v. Cannon*, which reexamined "the proper analysis of challenges to antenuptial agreements in Maryland law and the role, if any, in that analysis of an asserted confidential relationship between the parties to such agreements." 384 Md. 537, 543 (2005). In *Cannon*, the Court traced the evolution of the legal analysis of premarital agreements in Maryland. The Court first observed that premarital agreements are contracts, and so—like all other contracts—they must be reviewed "under the objective law of contract interpretation."[13] *Id.* at 553. Similarly, like all other contracts, premarital agreements must be reviewed "for good faith, consideration, and the parties' objective intent," *id.*, and may be invalidated "for fraud, duress, coercion, mistake, undue influence, or a party's incompetence," or "unconscionability at the time the contract was entered," *id.* at 554. Finally, as a general matter, "a party seeking to invalidate a contract who demonstrates that a confidential

---

[13] "Maryland adheres to the principle of the objective interpretation of contracts," *Cochran v. Norkunas*, 398 Md. 1, 16 (2007), under which "[w]hen the clear language of a contract is unambiguous, the court will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used," *Mattingly*, 415 Md. at 326 (quoting *Sy-Lene of Wash.*, 376 Md. at 167). When a "contract is ambiguous," however, "the court must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract." *Mattingly*, 415 Md. at 327 (quoting *Sy-Lene of Wash.*, 376 Md. at 167-68). "The extrinsic evidence admitted must help interpret the ambiguous language and not be used to contradict other, unambiguous language in the contract." *Calomiris v. Woods*, 353 Md. 425, 441 (1999).

22

relationship existed between the parties thrusts the burden of proof to establish the validity of the contract on the party attempting to enforce the contract." *Id.* at 555.

The Court then reviewed its prior application of those general precepts of contract law to premarital agreements, and ultimately re-affirmed its "view that a confidential relationship exists, as a matter of law, between the parties entering an antenuptial agreement." *Id.* at 570. To the extent that premarital agreements are treated differently from other contracts, the Court observed, that is a consequence of the legal presumption of a confidential relationship. *Id.* at 572. Although that presumption "may be rebutted in a given case by the party seeking enforcement of the agreement," *id.*, if it is not rebutted, then the existence of the confidential relationship means that: (1) "the burden of proof correctly falls upon the party seeking to enforce the agreement," *id.* at 573; and (2) the "correct standard for determining the validity of an antenuptial agreement [is] . . . whether there is an 'overreaching, that is, whether in the atmosphere and environment of the confidential relationship there was unfairness or inequity in the result of the agreement or procurement,'" *id.* (quoting *Hartz v. Hartz*, 248 Md. 47, 57 (1967)). The party seeking to enforce the agreement may show the absence of overreaching in a number of ways. He or she may (a) "document[] a full, frank, and truthful disclosure of his or her assets and their worth before the antenuptial agreement is signed," (b) demonstrate the other party's "knowledge of th[ose] assets," (c) show that the agreement "was not unfairly disproportionate . . . at the time the agreement was entered," or (d) otherwise prove that "overreaching did not occur." *Id.* at 573-74. With respect to the last option, the Court suggested that "the trial court may consider such factors as the extent of the disclosure (if

23

any), whether the attacking party had the opportunity to seek legal advice before signing the agreement, and whether the attacking party voluntarily and knowingly relinquished his or her rights." *Id.* at 574.

Most notably for our purposes, *Cannon* makes clear that the heightened standard applicable to a premarital agreement is triggered by "the presumption of a confidential relationship" between the parties. *See id.* at 571. Because the law presumes a "confidential relationship [exists] . . . between the parties entering into that kind of an agreement," *Stewart v. Stewart*, 214 Md. App. 458, 468 (2013), courts reviewing premarital agreements must reallocate the burden of proof and examine whether the agreement at issue is unfair or inequitable, *see Cannon*, 384 Md. at 572-73. In determining whether we should apply that same framework to a *mahr*, then, the question is not whether a *mahr* is identical in all respects to the premarital agreements our courts have more frequently encountered, but rather whether parties enter a *mahr* in circumstances where "a confidential relationship is presumed to exist as a matter of law." *Id.* at 572. We conclude that they do.

Here, both sets of parties entered their respective *mahrs* in conjunction with their Islamic marriage ceremonies, which in both cases were roughly contemporaneous with their secular marriage ceremonies, and both negotiated the terms of the *mahrs* while they were engaged and in anticipation of their forthcoming marriages. In both cases, the agreements "rel[ied] upon marriage as consideration," *see Cannon*, 384 Md. at 556 n.8, and "disposed of rights [or] property" between the prospective spouses, *see id.* at 561-62. In other words, these *mahrs* are agreements (1) entered into by parties who were engaged to be married, (2) that purport to direct the allocation of certain property during or at the

24

conclusion of the marriage, and (3) for which marriage serves as the consideration. Those are the same circumstances that give rise to the presumption of a confidential relationship when parties enter (other) premarital agreements. *See id.* at 571 ("[W]hen parties in a premarital relationship enter an antenuptial agreement where the consideration for the agreement is the impending marriage, a confidential relationship necessarily arises."); *see also In re Marriage of Bonds*, 5 P.3d 815, 829 (Cal. 2000) (identifying aspects of premarital contracts that differ from commercial contracts, including that (1) "the parties generally enter into the agreement anticipating that it never will be invoked," and (2) "the agreement . . . exists to provide for eventualities that will arise only if the relationship founders, possibly in the distant future under greatly changed and unforeseeable circumstances").

Dr. Dadgar and Ms. Mojarrad observe, correctly, that *mahrs* are not identical to premarital agreements our courts have previously considered. Although that is true, none of the differences they identify are material to whether the agreements are entered in the context of a confidential relationship, which is the critical factor for determining whether to apply heightened review. One difference is that although a traditional premarital agreement is entered before the wedding ceremony, the parties to a *mahr* generally enter the agreement as part of the ceremony. *See* Oman, 2011 Utah L. Rev. at 322. That difference does not, however, render the parties' relationship any less confidential at the time that they negotiate (usually before, and sometimes at, the ceremony) and enter the agreement. Similarly, the Islamic wedding ceremony at which the *mahr* is traditionally entered either may precede the parties' civil marriage, as in *Nouri*, or succeed it, as in *Ghazirad*, but that also does not render the parties' relationship at the time any less

confidential, at least where the ceremonies are roughly contemporaneous and are treated by the parties as related steps in establishing their marital bond.

Dr. Dadgar and Ms. Mojarrad also point out that a *mahr* generally is limited to addressing the disposition of a particular asset (in these cases, gold coins and a Quran) or obligation (a *hajj* trip), whereas (other) premarital agreements generally resolve issues related to support and the division of the parties' rights and assets more comprehensively. That difference, as well, is not material to whether the agreements are entered in the context of a confidential relationship. Moreover, there is no legal requirement that premarital agreements be comprehensive. For example, Maryland courts have analyzed as premarital agreements contracts that provided only for the transfer of certain specified assets, *see, e.g.*, *Schnepfe v. Schnepfe*, 108 Md. 139 (1908) (husband reserved 52 shares of stock for purpose of satisfying obligation to pay wife $12,000 upon his death), and have enforced premarital agreements that applied only to a portion of the marital estate, *see, e.g.*, *Stewart*, 214 Md. App. at 472 n.4 (premarital agreement waived wife's interest in husband's company and certain other premarital property, but not her interest in alimony and marital property).

A final difference with respect to these particular *mahrs*, and the one relied on by the circuit court in *Nouri*, is that "[a] divorce is not required for a Wife to obtain the funds from the *mahr*." As an initial matter, we observe that this feature is not necessarily common to all *mahrs*. The parties' experts in both cases indicated that, at least in principle, a *mahr* is payable upon the wife's demand at any time. *See also* Oman, *supra*, at 302 ("Upon marriage the wife is entitled to the mahr; any delay is a matter of contractual forbearance on her part."). Other authorities have observed, however, "that by Islamic

26

custom, the demand for payment of the Mahr Agreement is usually not made unless there is the death of the husband or a divorce action." *Odatalla*, 810 A.2d at 97-98; *see also* Oman, *supra*, at 302 ("Such delays are standard . . . . [A]lmost always, . . . the bulk of the mahr [is] due upon divorce or the husband's death."). Regardless, the difference does not determine whether the contract was entered in the context of a confidential relationship. Indeed, at oral argument, Dr. Dadgar's counsel conceded that Dr. Nouri and her client were in a confidential relationship at the time they agreed to the *mahr*. That, without more, is sufficient to invoke heightened review. Accordingly, we hold that *mahrs* should be scrutinized under "the stringent tests" applicable to a "confidential relationship."[14] *Frey v. Frey*, 298 Md. 552, 564 (1984).

In an argument that is unique to his case, Mr. Ghazirad argues that his *mahr* lacked consideration because he and Ms. Mojarrad entered it several weeks after they were married civilly. Thus, Mr. Ghazirad contends, the marriage could not have been consideration for the *mahr* because the parties already were married at the time the agreement was signed. For two reasons, we disagree.

---

[14] Some commentators have argued that *mahrs* should not be analyzed as premarital agreements because, in light of the absence of marital property in Islamic law, they "are not intended to alter the parties' rights to property upon divorce." Oman, *supra*, at 305-06, 323; *see also, e.g.*, Brian H. Bix, *Marriage Agreements and Religion*, 2016 U. Ill. L. Rev. 1665, 1670-71 (2016); Lindsey E. Blenkhorn, Note, *Islamic Marriage Contracts in American Courts: Interpreting Mahr Agreements as Prenuptials and Their Effect on Muslim Women*, 76 S. Cal. L. Rev. 189, 203-04 (2002). However, as explained in *Cannon*, we subject premarital agreements to heightened review not because they alter the parties' default entitlements under the law, but because of the presumed confidential relationship of the parties at the time they are entered. In each case, regardless of which party ultimately would be advantaged or disadvantaged by enforcement of a *mahr*, a court must determine if the *mahr* is overreaching—that is to say, whether it is fair in result and procurement.

27

First, although the agreement was not entered until the Islamic marriage ceremony, both parties testified that the terms of the *mahr* had been negotiated before they were married civilly. In fact, the parties' civil marriage and their Islamic marriage both comprised parts of the same nuptial transaction: one ceremony satisfied the demands of the civil government and the other met the requirements of the couple's religious tradition and culture. Nothing in the record suggests that in considering whether Mr. Ghazirad and Ms. Mojarrad were in a confidential relationship at the time they entered the *mahr*, we should accord significance to the order in which their wedding ceremonies happened to occur.[15]

Second, Mr. Ghazirad's argument does not recognize that the parties valued the Islamic marriage ceremony itself, separate and apart from the civil marriage. *See Seifeddine*, 934 N.W.2d at 70 (noting that "[t]he trial court found that the consideration for the [ ] mahr was the Islamic marriage ceremony"). Ms. Mojarrad testified that "[Mr. Ghazirad's] parents were the one[s] that were pushing for the Islamic marriage to be done after [she and Mr. Ghazirad] did the civil marriage." When asked at trial, "What's the significance of having an Islamic marriage to you? . . . Why did you do it?" Ms. Mojarrad answered, "Pretty much, you know, his parents demanded it." Mr. Ghazirad, for his part,

---

[15] We would not necessarily reach the same conclusion if the parties had negotiated and entered the *mahr* at a significantly later date. That is because "a confidential relationship arising during a marriage is not presumed to exist as a matter of law, but rather, is a question of fact." *Stewart*, 214 Md. App. at 480 n.9. Here, however, the two ceremonies occurred approximately two weeks apart, the *mahr* was negotiated in advance of both, and both ceremonies were treated by the parties as part of a single marriage transaction.

28

testified that "because [Ms. Mojarrad's] family is [ ] religious" he and she "had to perform the Islamic marriage." He said that he and Ms. Mojarrad "both agreed" that they "wanted to get this [marriage] done and then . . . make sure it's [under] Islamic law that [they] were considered wife and husband." As reflected in testimony, the parties and their families continued to place significant value on the Islamic marriage ceremony separate and apart from the civil marriage ceremony.[16]

In summary, at the time the parties in these cases entered their respective *mahrs*, they were in relationships that were presumptively confidential as a matter of law. As a result, unless the party seeking to enforce the agreement rebuts the presumption, the *mahrs* may be enforced only if their secular terms satisfy the heightened standards applicable to agreements between parties in a confidential relationship. To give the circuit court the opportunity to apply those standards, we will vacate the judgments in both cases and remand them to the circuit court.

### C. To the Extent that the *Mahrs* in These Cases Constitute Valid Contracts Between Parties in a Confidential Relationship, They Are Not Void as Against Public Policy.

Along with their First Amendment challenge, Dr. Nouri and Mr. Ghazirad also argue that their respective *mahrs* are void as against public policy in several respects. They contend that the *mahrs*: (1) violate Maryland's public policy preference for "equitable distribution and fairness in divorce actions"; (2) unreasonably encourage divorce; and

---

[16] *Ahmed v. Ahmed*, 261 S.W.3d 190 (Tex. Ct. App. 2008), on which Mr. Ghazirad relies for the proposition that a *mahr* is not a premarital agreement, is inapposite. That case involved the requirements of a Texas statute that, unlike under Maryland law, defined premarital agreements based on certain specified criteria.

(3) constitute "dowers," which Maryland abolished in 1969. *See* Md. Code Ann., Estates & Trusts § 3-202 (1974). Dr. Dadgar and Ms. Mojarrad respond that the *mahrs* (1) do not conflict with Maryland's public policy preference for equitable distribution; (2) do not unreasonably encourage divorce because "payment was not contingent upon dissolution of the parties' marriage[s]"; and (3) do not constitute "dowers" under Maryland law. We agree with Dr. Dadgar and Ms. Mojarrad.

First, properly construed and analyzed as contracts between parties in a confidential relationship, the *mahrs* do not conflict with public policy because Maryland law expressly permits couples to enter contracts that alter the presumptive consequences of the dissolution of a marriage. *See* Md. Code Ann., Family Law § 8-201(e)(3)(iii) (Repl. 2019) (excluding from the definition of "marital property" any property that is "excluded by valid agreement"); *see also Cannon*, 384 Md. at 561 (noting that premarital agreements "allow[] parties to agree 'what property is not to be considered marital property or family use personal property' and thus 'control the distribution of property upon divorce'" (quoting *Frey*, 298 Md. at 562)). In other words, although "the 'default' under Maryland law is that [each spouse] has marital property rights in property titled in the [other]'s name," that default rule may be overcome by "a premarital or post-marital agreement that validly relinquishe[s] . . . rights in marital property." *Aleem v. Aleem*, 404 Md. 404, 407-08 (2008) (quoting *Aleem v. Aleem*, 175 Md. App. 663, 681 (2007)). So long as the secular terms of such agreements satisfy the heightened scrutiny applied to contracts entered into by parties

30

in a confidential relationship, public policy does not prevent their enforcement.[17]  *See*

*Cannon*, 384 Md. at 573-74.

Second, the *mahrs* do not unreasonably encourage divorce.  Neither of these *mahrs*

is expressly contingent on divorce.  Thus, *In re Marriage of Noghrey*, 215 Cal. Rptr. 153

(Ct. App. 1985), on which Dr. Nouri and Mr. Ghazirad both rely, is inapposite.[18]  There,

the California intermediate appellate court addressed the enforceability of a *ketubah*[19]

provision that promised the wife "$500,000.00 or one-half of [the husband's] assets,

whichever is greater, in the event of a divorce." *Id.* at 154.  The court held that the provision

"encourage[d] and promote[d] divorce" and was therefore "contrary to the public policy of

---

[17] To avoid any misunderstanding, we add a cautionary note about our holding today.  As we observed above, one purpose attributed to *mahrs*—as they developed in societies governed by legal systems that do not recognize marital property—is to provide women a means of support after divorce or the husband's death.  As a result, some have argued that entering a *mahr* constitutes an implied waiver of rights to marital property, a monetary award, or spousal support.  *E.g.*, *Turfe*, 233 Cal. Rptr. 3d at 318 (summarizing husband's argument); *see also Chaudry v. Chaudry*, 388 A.2d 1000, 1006 (N.J. App. Div. 1978) (holding that a Pakistani-American "wife [was] not entitled to equitable distribution by reason of the antenuptial agreement [*mahr*], which . . . could have lawfully provided for giving her an interest in her husband's property, but [ ] contained no such provision"); *but see Aleem v. Aleem*, 175 Md. App. 663, 675-76 (2007) (declining to follow *Chaudry*), *aff'd*, 404 Md. 404 (2008); *cf.* Blenkhorn, *supra*, at 205 (criticizing *Chaudry*).  Neither Dr. Nouri nor Mr. Ghazirad has advanced that argument here.  In any event, based on our holding that *mahrs* may be enforced only if their purely secular terms satisfy the heightened standards applicable to agreements entered into by parties in a confidential relationship, we do not see how any such purportedly implied waiver could ever be enforceable in a Maryland court.

[18] Dr. Nouri and Mr. Ghazirad also cite *Neilson v. Neilson*, 780 P.2d 1264 (Utah Ct. App. 1989), and *In re Marriage of Dajani*, 251 Cal. Rptr. 871 (Ct. App. 1988), which are to similar effect as *Noghrey* and inapposite for the same reasons.

[19] A *ketubah* is a Jewish marriage contract, similar for present purposes to an Islamic marriage contract.  *See, e.g.*, *Avitzur v. Avitzur*, 446 N.E.2d 136 (N.Y. 1983).

31

th[e] state and unenforceable." *Id.* at 155. It reasoned that the agreement "constitute[d] a promise by the husband to give the wife a very substantial amount of money and property, *but only upon the occurrence of a divorce*." *Id.* at 156. If "the husband suffer[ed] an untimely demise," conversely, then that would "nullify[] the contract, and the wife's right to the money and property." *Id.* The *ketubah* provision thus "encouraged [the wife] . . . to seek a dissolution, and with all deliberate speed," to obtain the amount promised. *Id.*

Here, unlike the agreement in *Noghrey*, neither of the agreements is expressly contingent on divorce, nor is either subject to cancellation upon the husband's death. Moreover, one purpose for which *mahrs* exist generally is to *discourage* divorce, *see Aleem*, 404 Md. at 410 n.5, and nothing in the record of either case suggests that the prospect of a *mahr* payment actually encouraged the breakup of either marriage. Although the contents of most premarital agreements could, depending on circumstances, be deemed to encourage one party or the other to seek a divorce—or at least to make that path more palatable—Dr. Nouri and Mr. Ghazirad have not demonstrated that *mahrs* generally, or these *mahrs* specifically, unreasonably "encourage[d] or promote[d] dissolution" of marriage in violation of public policy. *See In re Marriage of Dawley*, 551 P.2d 323, 329 (Cal. 1976) (en banc).

32

Third, *mahrs* are not "dowers." Although the words "dower" and "dowry" share a common etymology,[20] the concepts are different. "Dower is a common-law right of a surviving widow to a life estate in one-third of the inheritable real estate owned by the husband during the coverture" (i.e., the marriage). *Silberman v. Jacobs*, 259 Md. 1, 7 (1970) (quoting *Lefteris v. Poole*, 234 Md. 34, 38 (1964)). "Dowry," conversely, was, at common law, "[t]he money, goods, or property that a woman br[ought] to her husband in marriage." Black's Law Dictionary, "dowry," at 622 (11th ed. 2019). Even if the *mahr* could be characterized as a form of "dowry," it bears no relation to the estate of "dower," which was a common law right, not a contractual one. *See In re Marriage of Dajani*, 251 Cal. Rptr. at 871 n.2 ("'Dower,' in modern use, is distinguished from 'dowry.' The former is a provision for a widow on her husband's death; the latter is a bride's portion on her marriage." (quoting Black's Law Dictionary, "dower," at 581 (4th ed. 1951)); *see also, e.g.*, *United States v. Schippers*, 982 F. Supp. 2d 948, 960 (S.D. Iowa 2013) ("A 'dower' right is not to be confused with 'dowry' . . . ."). Thus, the enforceability of the *mahrs* in these cases is unaffected by the abolition of the estate of dower. As discussed above, Maryland has not abolished the ability of parties to enter contracts in contemplation of marriage that govern disposition of their assets at a later date.

---

[20] Both ultimately derive from the Latin word *dotarium*, meaning marriage portion. *See Dower*, Merriam-Webster (2020), https://www.merriam-webster.com/dictionary/dower (accessed Feb. 13, 2020); *Dowry*, Merriam-Webster (2020), https://www.merriam-webster.com/dictionary/dowry (accessed Feb. 13, 2020).

Finally, Dr. Nouri also argues before us that *mahrs* violate the federal Constitution's Equal Protection Clause because, as a matter of Islamic religious practice, they are payable only by men to women, and never by women to men. Dr. Nouri has not preserved this contention for our review, however, because he did not present it for decision to the circuit court.[21] *See* Md. Rule 8-131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court . . . .").

## II. ON REMAND, THE CIRCUIT COURT MUST DETERMINE WHETHER THE *MAHRS* ARE ENFORCEABLE AS CONTRACTS BETWEEN PARTIES IN A CONFIDENTIAL RELATIONSHIP UNDER NEUTRAL PRINCIPLES OF LAW.

On remand, the circuit court must consider whether the *mahrs* in these cases may be enforced as contracts entered between parties in a confidential relationship.

---

[21] In Dr. Nouri's reply brief, he contends that the claim was "fully briefed in [a] Post-Trial Memorandum." But Dr. Nouri has not provided a copy of such a memorandum in the record extract or in an appendix to either of his briefs, nor has he even pointed us to a page of the record where we could expect to find that argument. It is not this Court's obligation to comb the record for support for a party's position.

If we were to reach Dr. Nouri's equal protection argument, we are skeptical that it would succeed. The essence of the argument is that under Islamic religious law, a *mahr* is an obligation that runs from a man to a woman, and never the other way. As we have discussed at length, however, the duty of a secular court is to interpret the secular terms of a contract, not Islamic (or any other) religious law. We do not consider, much less pass judgment on, any religious doctrines or personal beliefs that may have motivated parties to enter a *mahr* or craft its terms, and we will enforce the secular terms of the agreement provided they are valid under neutral principles of law and do not offend the laws or public policy of our State or federal governments. Indeed, a Maryland court would not treat any differently an identically-worded provision running from a woman to a man or between individuals of the same sex and gender, whether contained in an Islamic marriage contract, a contract arising in a different religious context, or an entirely secular agreement. Here, the secular terms of Dr. Nouri's *mahr* require him to pay Dr. Dadgar a certain sum. Enforcing one spouse's agreement to make a payment to the other does not offend guarantees of equal protection.

34

Accordingly, Dr. Dadgar and Ms. Mojarrad will bear the burden to show, first, that the agreements meet the standards for validity of all contracts. The contracts must be supported by mutual assent manifested by "(1) intent to be bound, and (2) definiteness of terms," as well as by consideration. *See Falls Garden Condo. Ass'n v. Falls Homeowners Ass'n*, 441 Md. 290, 302 (2015) (quoting *Cochran v. Norkunas*, 398 Md. 1, 14 (2007)); *see also Lillian C. Blentlinger, LLC v. Cleanwater Linganore*, 456 Md. 272, 302 (2017) ("To be binding and enforceable, contracts ordinarily require consideration. In Maryland, consideration may be established by showing a benefit to the promisor or a detriment to the promisee." (quoting *Cheek v. United Healthcare of Mid-Atl.*, 378 Md. 139, 147-49 (2003))). Beyond that, Dr. Dadgar and Ms. Mojarrad must show that the agreement each entered was not the product of "overreaching, that is, whether in the atmosphere and environment of the confidential relationship there was unfairness or inequity in the result of the agreement or in its procurement." *Cannon*, 384 Md. at 559 (emphasis removed) (quoting *Hartz*, 248 Md. at 57). In other words, "[t]he agreement must be fair and equitable in procurement and result." *Frey*, 298 Md. at 563.

Both Dr. Nouri and Mr. Ghazirad raise issues that might be relevant to whether the agreements, at the time they were entered, were fair and equitable in procurement or result. Mr. Ghazirad, for example, contends that he did not have the capacity to pay the amount of the *mahr* at the time it was entered, apparently to suggest that his intent was to show his commitment to the marriage, not to agree to assume a debt he was incapable of satisfying.

35

That contention, and any others that are relevant to considering the validity of the *mahrs*, are for the circuit court to address in the first instance.[22]

### III. THE CIRCUIT COURT DID NOT ERR IN PERMITTING DR. DADGAR TO AMEND HER COUNTERCLAIM.

Dr. Nouri raises one additional issue, unique to his case. He contends that the circuit court erred in permitting Dr. Dadgar to amend her counterclaim less than ten days before trial to request expressly that the court adjudicate the enforceability of the *mahr*. Dr. Nouri argues that Dr. Dadgar's belated amendment did not comply with Rule 2-341,[23] and that it prejudiced him by "interject[ing] a new element into the case immediately prior to trial."

---

[22] Dr. Nouri and Mr. Ghazirad both argue that if the *mahrs* they entered are enforceable by a Maryland court, the amount of the *mahr* should be considered marital property. In light of our resolution of the other issues they raise, we need not address that matter, which necessarily will be left for another day.

[23] Rule 2-341, governing amendments, provides in relevant part:

(a) *Without Leave of Court*. A party may file an amendment to a pleading without leave of court by the date set forth in a scheduling order or, if there is no scheduling order, no later than 30 days before a scheduled trial date. . . .

(b) *With Leave of Court*. A party may file an amendment to a pleading after the dates set forth in section (a) of this Rule only with leave of court. . . .

(c) *Scope*. An amendment may seek to (1) change the nature of the action or defense, (2) set forth a better statement of facts concerning any matter already raised in a pleading, (3) set forth transactions or events that have occurred since the filing of the pleading sought to be amended, (4) correct misnomer of a party, (5) correct misjoinder or nonjoinder of a party so long as one of the original plaintiffs and one of the original defendants remain as parties to the action, (6) add a party or parties, (7) make any other appropriate change. Amendments shall be freely allowed when justice so permits. . . .

Dr. Nouri also asserts that Dr. Dadgar failed to comply with Rule 2-331, governing counterclaims. Because Dr. Dadgar's filing was an amendment of a timely-filed counterclaim, however, it is Rule 2-341 that applies.

36

Dr. Dadgar responds that Dr. Nouri was not prejudiced by the amendment because "[t]he issue of the *Mahr* was well known to all parties involved from" the beginning of the case.

Maryland courts have imposed a "liberal construction . . . on the allowance of amendments to pleadings." *Ski Roundtop v. Wagerman*, 79 Md. App. 357, 371 (1989). Although "[t]he determination to allow amendments to pleadings or to grant leave to amend pleadings is within the sound discretion of the trial judge," *Schmerling v. Injured Workers' Ins. Fund*, 368 Md. 434, 443-44 (2002), such "amendments should be freely allowed in order to promote justice," *Crowe v. Houseworth*, 272 Md. 481, 485 (1974); *see* Rule 2-341(c) ("Amendments shall be freely allowed when justice so permits."). We prefer that "cases [ ] be tried on their merits rather than upon the niceties of pleading," *Crowe*, 272 Md. at 485, especially when they concern an equitable matter such as divorce. *See McMahon v. Piazze*, 162 Md. App. 588, 599 (2005) (indicating that court should have "allow[ed] amendment" in a child custody case because "the issue is the best interest of a child, an issue that is not ordinarily decided on a point of pleading"). Here, where the trial court allowed the untimely amendment, we will not reverse its decision "in the absence of a clear showing of an abuse of discretion." *Crowe*, 272 Md. at 489.

The primary situation in which "an amendment should not be allowed" is where "it would result in prejudice to the opposing party." *RRC Northeast v. BAA Md.*, 413 Md. 638, 673-74 (2010). As the party opposing the amendment, Dr. Nouri bore the burden of showing that he would be prejudiced. *See Mattvidi Assocs. Ltd. P'ship v. NationsBank of Va.*, 100 Md. App. 71, 80 (1994). He made no such showing in this case.

Although Dr. Nouri asserts that Dr. Dadgar's claim for the *mahr* added "an entirely new cause of action," to which he did not have time to respond prior to trial, the record shows that the *mahr* was a significant issue from the outset of the case. Indeed, it was Dr. Nouri who first introduced the *mahr* into the pleadings, by amending his complaint to add a request that the circuit court "decree that the Islamic Marriage Contract is unenforceable." Both parties designated expert witnesses on Iranian law almost a year before trial, and those experts testified at length regarding the validity of the *mahr*. The parties themselves and their relatives also testified at trial concerning the negotiation of the *mahr* and their understanding of its terms. Dr. Nouri admits that irrespective of whether Dr. Dadgar amended her counterclaim, the trial court needed to "be aware of [the Iranian litigation] in fashioning a monetary award." In sum, after Dr. Dadgar's amendment of her counterclaim, "'the operative factual situation' . . . 'remain[ed] essentially the same' as that alleged in the prior pleading[s]." *See Youmans v. Douron, Inc.*, 211 Md. App. 274, 291 (2013) (quoting *Crowe*, 272 Md. at 485-86). Therefore, Dr. Dadgar's request to amend her counterclaim did not introduce unfairly "a 'new cause of action'" days before trial. *See id.*

Dr. Nouri argued to the circuit court that he had been prejudiced because he had not had time to "address[] . . . constitutional issues" regarding the enforceability of the *mahr* in American courts. However, in the amended complaint he filed before Dr. Dadgar sought leave to amend her counterclaim, Dr. Nouri had listed eight different reasons why he believed the *mahr* was unenforceable, including that it conflicted with Maryland public policy and federal law and that it was overreaching and unconscionable. We cannot

understand why Dr. Dadgar's amended claim, but not his own, would have led Dr. Nouri to consider for the first time constitutional issues regarding the enforceability of a *mahr*.

Dr. Nouri also contends that the circuit court should not have addressed the enforceability of the *mahr* so as to avoid the possibility of inconsistent or duplicative judgments. He cites *Bajgain v. Bajgain*, 769 S.E.2d 267 (Va. Ct. App. 2015), for the proposition that the circuit court should have deferred to the Iranian court to avoid the possibility of a "double award." As he acknowledges candidly, though, "*Bajgain* is clearly distinguishable." There, a husband filed for divorce in Virginia and his wife initiated parallel proceedings in the couple's home country of Nepal. *Bajgain*, 769 S.E.2d at 269. While the Nepal case was pending, the couple asked the court to stay the Virginia proceedings and stipulated that "[i]f the court in Nepal . . . set[] forth orders regarding certain pieces of property, then those pieces of property would not be re-litigated in th[e] [Virginia] court." *Id.* at 270. Subsequently, the court in Nepal issued an order dividing the couple's property, and the husband moved to dismiss his wife's claim for equitable distribution in Virginia. *Id.* The Virginia court granted the husband's motion on the basis that the decision in Nepal was res judicata. *Id.* at 270-71. Virginia's intermediate appellate court affirmed, holding that the "wife agreed to be bound by whatever issues were resolved to finality in Nepali courts." *Id.* at 274.

Here, by contrast, the parties never entered a "joint stipulation not to relitigate issues litigated to finality in" Iran, *see id.* at 275, nor did they ever both participate in the same proceeding to resolve the issue in Iran. By the time Dr. Dadgar amended her counterclaim, she had withdrawn her attempt to collect the *mahr* in Iran, and she was not a party to—and

39

apparently did not know about—the Iranian annulment proceeding in which Dr. Nouri attempted unsuccessfully to void the *mahr*. Dr. Nouri may have believed that the parties agreed *implicitly* to resolve the *mahr* issue in Iran, but that belief does not have the preclusive effect of the on-the-record joint stipulation in *Bajgain*. *See id.* at 276 ("[T]he stipulation's preclusive effect . . . forecloses wife from sidestepping the adverse judgment that she obtained in Nepal."). That is particularly so because it was Dr. Nouri, not Dr. Dadgar, who first raised the issue of the *mahr* in the Maryland proceedings.[24]

"[I]t is the rare situation in which a court should not grant leave to amend." *RRC Northeast*, 413 Md. at 673. This case does not present such a situation. Because Dr. Nouri "suffered no prejudice from the belated filing," *see Schmerling*, 368 Md. at 457, we hold that the court did not abuse its discretion in permitting Dr. Dadgar's amendment.

## CONCLUSION

We hold:

1. Provisions in religious contracts such as *mahrs* may be enforced by a Maryland court if, and only if, their secular terms are enforceable under neutral principles of contract law.

---

[24] If either party had requested that the circuit court defer to the Iranian proceedings, then the court would have needed to consider whether to do so under principles of comity. *See generally Apenyo v. Apenyo*, 202 Md. App. 401 (2011); *Johns Hopkins Health Sys. Corp. v. Al Reem Gen. Trading & Co.'s Rep. Est.*, 374 F. Supp. 2d 465 (D. Md. 2005); *cf. Ravasizadeh v. Niakosari*, 112 N.E.3d 807, 813 (Mass. App. Ct. 2018) (deciding to "apply the rule of comity and not [to] disturb the ruling of the Iranian courts" regarding a disputed *mahr* because "[b]*oth* parties ha[d] submitted the mahr to the jurisdiction of the courts in Iran and *neither* ha[d] argued that those courts should not decide the matter" (emphasis added)). Here, however, that did not happen. Instead, both parties sought orders from the circuit court declaring the enforceability of the *mahr*. *Cf. Ravasizadeh*, 112 N.E.3d at 813 (reasoning that abstention in favor of foreign proceedings was appropriate because "the parties . . . ha[d] not sought enforcement of the mahr in Massachusetts courts").

2. For *mahrs* such as those at issue here, the neutral principles to apply are those governing the enforcement of contracts entered into by parties in a confidential relationship.

3. Remand is required in these cases so that the circuit court may determine whether the parties seeking to enforce the *mahrs* have shown that they are enforceable and not tainted by "overreaching, that is, whether in the atmosphere and environment of the confidential relationship there was unfairness or inequity in the result of the agreement or procurement." *Cannon v. Cannon*, 384 Md. 537, 573 (2005) (quoting *Hartz v. Hartz*, 248 Md. 47, 57 (1967)).

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY VACATED. CASES REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.**